Matthew C. Helland, CA State Bar No. 250451
NICHOLS KASTER, LLP
One Embarcadero Center, Suite 720
San Francisco, CA 94111
Telephone: (415) 277-7235; Facsimile: (415) 277-7238
helland@nka.com

Adam W. Hansen, CA State Bar No. 264241
APOLLO LAW, LLC
400 South 4th Street, Suite 401M – 250
Minneapolis, MN  94415
Telephone: (612) 927-2969; Facsimile: (419) 793-1804
adam@apollo-law.com

Kai H. Richter, MN Bar No. 0296545*
Brock Specht, MN Bar No. 0388343*
  * pro hac vice application forthcoming
NICHOLS KASTER, PLLP
4600 IDS Center, 80 S. Eighth Street
Minneapolis, MN 55402
Telephone: (612)256-3278; Facsimile: (612) 338-4878
krichter@nka.com
bspecht@nka.com

Attorneys for Plaintiff and the Class

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Randall Holl, individually, on behalf of others similarly situated, and as a representative of the class, <br><br>            Plaintiff, <br><br>     v. <br><br> United Parcel Service, Inc., <br><br>            Defendant. | **Case No. 3:16-cv-5856** <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES AND RESTITUTION** <br><br> **(1)  Conducting the Affairs of an Enterprise in Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, *et seq.*)** <br><br> **(2) Providing False or Misleading Information in Violation of the Interstate Commerce Act 49 U.S.C. § 13708(b)** <br><br> **(3)  Unjust Enrichment in Violation of Federal Common Law** <br><br> **(4)  Unjust Enrichment in Violation of State Common Law** |

## PRELIMINARY STATEMENT

1.     This case concerns a widespread, fraudulent billing practice perpetuated by United Parcel Service (more commonly known as UPS). Summarized in a single paragraph: UPS charges customers a fee called a "Delivery Area Surcharge" to deliver packages to certain remote areas in the lower forty-eight states. According to UPS's published rates, the fee, depending on the circumstances, ranges from $1.50 to $4 per package. With respect to customers who hold UPS accounts (typically frequent shippers like large businesses and government agencies), UPS charges the fee in accordance with its advertised rates. For many years, however, UPS has engaged in a bait and switch with respect to *retail customers*—customers who ship packages through UPS's third-party affiliates, including UPS Store centers. These customers are charged a Delivery Area Surcharge that is approximately *double* the amount listed in the company's published rates.

2.     This practice of overcharging retail customers through a fraudulently-inflated Delivery Area Surcharge is both systematic and severe. UPS controls a network of over 16,000 retail stores. Although each retail location is independently owned and operated, each location charges retail customers the inflated Delivery Area Surcharge. UPS controls and directs the assessment of the inflated charges on retail customers through a centralized software platform called iShip, which every UPS retail affiliate must use in originating shipments though UPS. UPS's retail affiliates are not responsible for the assessment of the inflated Delivery Area Surcharge—indeed, they are powerless to stop the practice. UPS purposely and explicitly engineered its shipping software to charge retail customers approximately double the company's published Delivery Area Surcharge. UPS retains for itself all of the ill-gotten profits from the inflated charges.

3.     All of this begs the question: why does UPS not implement two sets of Delivery Area Surcharges—one for institutional account holders and another for retail customers? (UPS uses a similar two-tiered pricing structure for other charges and services, but has not typically done so for the Delivery Area Surcharge.). The answer lies in the fact that market forces create a powerful incentive for UPS to publish one rate and charge another. UPS operates in an extremely

competitive environment. Numerous websites compare shipping charges across various companies (including FedEx and the Unites States Postal Service), bringing market pressure to bear on UPS to match or beat its competitors' prices. Other websites—such as eBay—use shipping estimates when listing goods for sale. These estimates, of course, encompass only the published rates, not the inflated rates. And UPS knows what social psychologists have shown time and again: by falsely advertising a lower rate, consumers will commit to a given transaction without notice of the inflated charge, and will complete the transaction on the assumption that the amount demanded is honestly owed. UPS's published rates give the false impression in the marketplace that UPS's rates are lower than they really are, which brings customers in the door in greater numbers. Charging a higher fee in practice takes advantage of those same customers, adds to UPS's bottom line, and unfairly punishes UPS's competitors in the marketplace. By creating a bait and switch, UPS makes far more money than it would by fairly advertising its rates.

4.      The Delivery Area Surcharge is a particularly fertile ground for fraud. Because of the nature of the customers and shipping recipients, UPS was able to insulate itself from challenge—until now. Frequent shippers often employ shipping auditors to review invoices and contest improper charges. But anyone who ships frequently enough to warrant hiring a shipping auditor uses UPS services as an institutional accountholder—not as a retail customer. And as previously explained, UPS imposes the inflated Delivery Area Surcharge only on retail customers—not institutional account holders. The same is true of shipping *recipients*, who frequently bear the shipping costs. Because UPS imposes the inflated Delivery Area Surcharge exclusively on packages destined for more rural areas, UPS's improper charges are mostly borne by individual residents and small businesses living and operating in small towns. Because both the shippers and the recipients tend to be individual consumers, UPS knew that it could charge the inflated surcharge and likely pass undetected.

5.      Plaintiff brings this case to stop UPS's illegal practice and recover the fees improperly charged to retail customers.

**THE PARTIES**

6.     Individual and representative Plaintiff Randall Holl is an individual residing in Healdsburg, California, located in Sonoma County.

7.     Defendant United Parcel Service, Inc. ("UPS") is a Delaware corporation. UPS is headquartered in Atlanta, Georgia.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this case is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, the Interstate Commerce Act, 49 U.S.C. § 13101, *et seq.*, and federal common law. This Court also has supplemental jurisdiction over the state law claims, which arise out of the same common nucleus of facts, pursuant to 28 U.S.C. § 1367.

9.     This Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because members of the Plaintiff class (including the named Plaintiff) are citizens of states different from UPS, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10.     Venue is proper in the United States District Court, Northern District of California pursuant to 28 U.S.C. § 1391, because Defendant UPS operates in this district, and because a substantial part of the events giving rise to the claims occurred in this district.  Pursuant to Local Rule 3-2(d), this case is properly assigned to the San Francisco Division or Oakland Division because the case arose in Sonoma County.

**FACTUAL ALLEGATIONS**

**UPS's Business**

11.     Defendant UPS is the world's largest package delivery company.[1]  In 2015, UPS shipped 4.7 billion packages.[2]

---

[1] *See* https://www.ups.com/content/us/en/about/facts/.

[2] *See* https://pressroom.ups.com/pressroom/ContentDetailsViewer.page?ConceptType=FactSheets&id=1426321563187-193.

12.     Broadly speaking, UPS engages with customers in two different ways: as institutional customers and as retail customers. To become an institutional customer, the customer must sign up for a UPS account.[3] Customers using UPS accounts stand in a direct contractual relationship with UPS. UPS accountholders might, for example, establish regular package drop-off and pickup times at their homes or businesses. UPS sets forth the terms of its contractual relationship with accountholders in its Terms and Conditions of Service, which is attached as Exhibit A.

13.     Consumers can also use UPS's services through UPS's retail program. To do so, customers may ship a package with UPS through one of UPS's retail affiliates (or as UPS calls them, "Third Party Retailers"). Ex. A at 14. UPS's Third Party Retailers include UPS Stores, UPS Authorized Shipping Outlet Locations, and UPS Alliance Locations.

14.     UPS Stores are individual physical retail locations that are branded as "The UPS Store":



15.     As explained in UPS's terms, "The UPS Store® locations are independently owned and operated by licensed franchisees of The UPS Store, Inc., a subsidiary of United Parcel

---

[3] *See* https://www.ups.com/one-to-one/login?returnto=https%3a//www.ups.com/account/us/start%3floc%3den_us&reasonCode=-1&appid=OPENACCT.

Service, Inc." *See* Ex. A at 14. There were approximately 4,908 UPS Store locations operating as of 2015.[4]

16.    UPS Authorized Shipping Outlet Locations are similarly independently owned and operated businesses. But, unlike UPS Stores, UPS Authorized Shipping Outlet Locations are not branded as UPS locations and are not UPS franchises. Rather, UPS Authorized Shipping Outlet Locations offer UPS Services as contractors of UPS. There were approximately 10,113 UPS Authorized Shipping Outlet Locations operating as of 2015.[5]

17.    UPS Alliance Locations are similarly independently owned and operated businesses serving as UPS contractors. UPS Alliance Locations are located inside certain Staples and Office Depot stores. There were approximately 1,500 UPS Alliance Locations operating as of 2015.[6]

18.    UPS's Third Party Retailers "are not agents of UPS." *See* Ex. A at 14. Nor are they agents of retail customers or retail customers themselves. *Id.* UPS regards these Third Party Retailers as the "Shipper of the Package." *Id.* UPS makes clear that it will deal solely with Third Party Retailers—not consumers—as the "Shipper[s]." UPS makes similarly clear that UPS does not regard retail customers as its customers at all, and therefore such customers, according to UPS, must deal exclusively with UPS retailers—not with UPS directly:

> All inquiries regarding Packages shipped by any Third-Party Retailer must be directed to the Third-Party Retailer that shipped the Package. UPS will deal solely with the Third-Party Retailer in all matters concerning Packages shipped by any Third-Party Retailer including, but not limited to: tracking/tracing requests; claims and guarantees; C.O.D. preparation and remittance; return of undeliverable Packages; proper packaging and labeling; and billing. Even if UPS responds directly to customers of the Third-Party Retailer regarding tracking requests, UPS will not be liable to those customers. The Third-Party Retailer is solely responsible for the issuance of any refunds and claims to those who shipped Packages by the Third-Party Retailer.

---

[4] *See* https://pressroom.ups.com/pressroom/ContentDetailsViewer.page?ConceptType=FactSheets&id=1426321563187-193.

[5] *See* https://pressroom.ups.com/pressroom/ContentDetailsViewer.page?ConceptType=FactSheets&id=1426321563187-193.

[6] *See* https://www.ups.com/content/us/en/locations/alliances/index.html?WT.svl=SubNav.

*Id.*

19.     Customers who ship packages through one of UPS's retail affiliates do not enter a contractual relationship with UPS. As noted above, the retailer itself acts as the shipper and as the sole party in contractual privity with UPS. Indeed, UPS frequently defends itself in litigation against claims brought by retail customers by asserting that UPS does not have a contractual relationship with retail customers. *See, e.g., Siefer v. United Parcel Service, Inc.*, No. 212-2012-CV-00210, 2013 WL 8434806, at *3 (N.H. Super. Jan. 23, 2013) ("Siefer did not contract with UPS but rather with the UPS Store by which she shipped the package, and Siefer is not in privity of contract with UPS."); Brief for UPS at 7, *Tarr Technology Consulting LLC v. United Parcel Service, Inc.*, No. 6533012012, 2013 WL 9675800 (N.Y.Sup. Dec. 2, 2013) ("UPS has no liability to customers of a Third-Party Retailer for damages arising from packages shipped from Third-Party Retailers.").

### UPS's Daily and Retail Rates

20.     UPS publishes two rate sheets governing shipping rates in the lower forty-eight United States: (1) "Daily Rates" and (2) "Retail Rates." *See* Ex. A at 5.

21.     UPS's Daily Rates apply to customers who hold UPS accounts and originate shipments using their UPS accounts.

22.     UPS's Retail Rates, by contrast, apply to all shipments processed and paid for at one of UPS's Third Party Retailers, including UPS Stores, UPS Authorized Shipping Outlet Locations, and UPS Alliance Locations. *See id.*

23.     UPS's Daily Rates and Retail Rates operate as a step-by-step decision tree, dictating the cost of each package according to origin, destination, weight, size, contents, and other factors. UPS's rates are objective. Two shipments identical in every way will cost the exact same amount to ship, according to UPS's rates.

24.     In general, UPS's Retail Rates are higher than the company's Daily Rates. By way of example, UPS's 2016 Retail Rates for Ground service state that shipping a package through a retail location would cost more than shipping the same package with a UPS account under the Daily Rates for the same service:

*Retail:*

Domestic

UPS® Ground*

Guaranteed day-definite delivery typically in one to five business days to all 50 states and Puerto Rico. Refer to UPS Ground Time in Transit maps at ups.com/maps to determine scheduled delivery.

| Zones | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 44** | 45** | 46** |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Lbs. | $8.01 | $8.50 | $8.67 | $9.04 | $9.47 | $9.60 | $9.76 | $33.12 | $33.23 | $43.23 |
| 2 | 8.52 | 9.07 | 9.83 | 10.04 | 10.59 | 10.81 | 11.42 | 36.95 | 36.96 | 47.04 |
| 3 | 8.65 | 9.47 | 10.33 | 10.76 | 11.83 | 12.40 | 14.27 | 40.39 | 40.45 | 50.35 |
| 4 | 8.85 | 9.74 | 10.85 | 13.25 | 14.03 | 14.38 | 15.56 | 44.10 | 44.18 | 54.30 |
| 5 | 9.12 | 9.98 | 11.31 | 14.02 | 15.16 | 15.71 | 17.31 | 47.90 | 47.96 | 57.91 |
| 6 | 9.68 | 10.82 | 12.10 | 14.45 | 15.60 | 16.55 | 17.82 | 52.01 | 52.17 | 63.06 |

*Daily:*

Domestic

UPS® Ground*

Guaranteed day-definite delivery typically in one to five business days to all 50 states and Puerto Rico. Refer to UPS Ground Time in Transit maps at ups.com/maps to determine scheduled delivery.

| Zones | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 44** | 45** | 46** |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Lbs. | $6.94 | $7.58 | $7.79 | $8.13 | $8.42 | $8.53 | $8.66 | $26.50 | $26.60 | $34.92 |
| 2 | 7.66 | 8.25 | 8.91 | 9.10 | 9.49 | 9.69 | 9.96 | 29.47 | 29.01 | 37.88 |
| 3 | 7.78 | 8.60 | 9.40 | 9.68 | 10.08 | 10.42 | 11.01 | 32.04 | 33.05 | 40.35 |
| 4 | 8.03 | 8.81 | 9.85 | 10.29 | 10.59 | 11.09 | 11.80 | 35.18 | 35.25 | 43.75 |
| 5 | 8.07 | 8.88 | 10.21 | 10.68 | 10.93 | 11.50 | 12.38 | 38.14 | 38.27 | 46.56 |
| 6 | 8.35 | 9.13 | 10.34 | 10.89 | 11.19 | 11.79 | 12.48 | 41.15 | 40.72 | 48.33 |

**UPS's Delivery Area Surcharge**

25.     One feature, however, is common to both UPS's Retail and Daily Rates: the Delivery Area Surcharge. In 1999, both UPS and its competitor FedEx introduced a Delivery Area Surcharge. In a nutshell, UPS assesses a Delivery Area Surcharge on all packages destined for certain rural ZIP codes located in the lower forty-eight United States. The surcharge is applied on top of the base rate for any given shipment and listed as a separate line item on the shipping receipt. Below is a reproduction of UPS's description of the surcharge located in UPS's Retail Rates published on January 6, 2016:

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes™ within the 48 contiguous states. For Alaska and Hawaii, refer to page 119 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes.<br>– Delivery Area Surcharge does not apply to UPS Ground with Freight Pricing shipments. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.30 | $2.45 |
| | | – Residential | $3.15 | $3.70 |
| | | – Commercial Extended | $2.30 | $2.45 |
| | | – Residential Extended | $4.00 | $4.00 |
| | | Import:<br>– Delivery Area Surcharge: $2.00<br>– Delivery Area Surcharge Extended: $2.00 | | |

26.     In assessing the surcharge, UPS publishes a list of ZIP codes; the Delivery Area Surcharge applies to packages shipped to places located in those ZIP codes. *See* Exhibit B. The ZIP codes are divided into two categories: (1) regular and (2) "extended." ZIP codes listed as "extended" are generally more remote than ZIP codes listed in the regular category.

27.     Collectively, UPS's Delivery Area Surcharge applies to packages shipped to a vast swath of the country. According to a recent government report, the surcharge applies to shipments destined for over 40,000 unique ZIP codes.[7] Approximately 25 percent of the population of the lower forty-eight states lives within these ZIP codes. *Id.* at 5. And, by geography, the ZIP codes triggering the surcharge cover nearly 85 percent of the land mass of the lower forty-eight states. *Id.*

28.     Applying UPS's rates to determine the amount of any Delivery Area Surcharge is straightforward. As indicated in UPS's rate sheet pictured above, the amount of the surcharge depends on three factors: (1) the type of service ("Ground" versus "Air"), (2) the character of the recipient ("Commercial" versus "Residential") and (3) the recipient's ZIP code (regular versus "Extended"). Once all three factors are known, determining the correct Delivery Area Surcharge requires no more than simply looking at the grid and noting the applicable charge.

29.     UPS typically revises the amount of its Delivery Area Surcharge once every year. Until very recently, UPS listed identical Delivery Area Surcharges in its Daily and Retail Rates. This last point bears restating: until very recently, customers could expect to pay the same Delivery Area Surcharge regardless of whether they shipped packages through an institutional UPS account or through a UPS third-party retailer.

30.     The following excerpts from UPS's rates show the precise amount of the Delivery Area Surcharge over time:

---

[7] *See* http://www.prc.gov/sites/default/files/archived/Rural_Service_Report.pdf at 4.

*2012 Delivery Area Surcharge (Retail and Daily Rates identical):*

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes within the 48 contiguous states. For Alaska and Hawaii, refer to page 63 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-Pick-UPS® for a listing of applicable ZIP Codes. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.00 | $2.00 |
| | | – Residential | $2.75 | $3.00 |
| | | – Commercial Extended | $2.00 | $2.00 |
| | | – Residential Extended | $3.25 | $3.25 |

*2013 Delivery Area Surcharge (Retail and Daily Rates identical):*

| Delivery Area Surcharge | Package<br>– A surcharge applies to each package delivered to certain ZIP Codes within the 48 contiguous states. For Alaska and Hawaii, refer to page 79 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.00 | $2.15 |
| | | – Residential | $2.75 | $3.25 |
| | | – Commercial Extended | $2.00 | $2.15 |
| | | – Residential Extended | $3.50 | $3.50 |

*2014 Delivery Area Surcharge (Retail and Daily Rates identical):*

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes within the 48 contiguous states. For Alaska and Hawaii, refer to page 119 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.07 | $2.25 |
| | | – Residential | $2.85 | $3.40 |
| | | – Commercial Extended | $2.07 | $2.25 |
| | | – Residential Extended | $3.62 | $3.65 |
| | | Import:<br>– Delivery Area Surcharge: $2.00<br>– Delivery Area Surcharge Extended: $2.00 | | |

*2015 Delivery Area Surcharge (Retail and Daily Rates identical):*

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes™ within the 48 contiguous states. For Alaska and Hawaii, refer to page 119 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.20 | $2.35 |
| | | – Residential | $3.00 | $3.55 |
| | | – Commercial Extended | $2.20 | $2.35 |
| | | – Residential Extended | $3.80 | $3.80 |
| | | Import:<br>– Delivery Area Surcharge: $2.00<br>– Delivery Area Surcharge Extended: $2.00 | | |

*2016 Delivery Area Surcharge (Retail and Daily Rates identical until July 11, 2016):*

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes™ within the 48 contiguous states. For Alaska and Hawaii, refer to page 119 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes.<br>– Delivery Area Surcharge does not apply to UPS Ground with Freight Pricing shipments. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.30 | $2.45 |
| | | – Residential | $3.15 | $3.70 |
| | | – Commercial Extended | $2.30 | $2.45 |
| | | – Residential Extended | $4.00 | $4.00 |
| | | Import:<br>– Delivery Area Surcharge: $2.00<br>– Delivery Area Surcharge Extended: $2.00 | | |

31.     On July 11, 2016, UPS changed the Delivery Area Surcharge contained in its Retail Rates—but not its Daily Rates. For the first time, UPS now has two sets of Delivery Area Surcharges: one set under the Daily Rates and a second set under the Retail Rates:

*July 11, 2016 to present Delivery Area Surcharge Retail Rates:*

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes™ within the 48 contiguous states. For Alaska and Hawaii, refer to page 119 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes.<br>– Delivery Area Surcharge does not apply to UPS Ground with Freight Pricing shipments. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | No Add'l Charge | $2.45 |
| | | – Residential | No Add'l Charge | $3.70 |
| | | – Commercial Extended | $1.50 | $2.45 |
| | | – Residential Extended | $3.75 | $4.00 |
| | | Import:<br>– Delivery Area Surcharge: $2.00<br>– Delivery Area Surcharge Extended: $2.00 | | |

*2016 Delivery Area Surcharge Daily Rates (unchanged on July 11, 2016):*

| Delivery Area Surcharge | – A surcharge applies to each package delivered to certain ZIP Codes™ within the 48 contiguous states. For Alaska and Hawaii, refer to page 119 for the Remote Area Surcharge.<br>– Refer to the Area Surcharge Listing at ups.com/rates or call 1-800-PICK-UPS® for a listing of applicable ZIP Codes.<br>– Delivery Area Surcharge does not apply to UPS Ground with Freight Pricing shipments. | | Ground | Air |
|---|---|---|---|---|
| | | – Commercial | $2.30 | $2.45 |
| | | – Residential | $3.15 | $3.70 |
| | | – Commercial Extended | $2.30 | $2.45 |
| | | – Residential Extended | $4.00 | $4.00 |
| | | Import:<br>– Delivery Area Surcharge: $2.00<br>– Delivery Area Surcharge Extended: $2.00 | | |

32.     UPS's operative rate sheets containing the Delivery Area Surcharge are combined and attached as Exhibit C.

**UPS Charges Third-Party Retail Customers an Inflated Delivery Area Surcharge**

33.     Going back at least a decade and continuing to the present, UPS has engaged in a deliberate fraud by forcing its retail affiliates to charge customers Delivery Area Surcharges that significantly exceed UPS's published rates. For example, customers visiting UPS Stores are systematically charged a Delivery Area Surcharge that is several dollars higher than the published rate. The overcharges typically exceed the published rate by $1 to $3. The inflated Delivery Area Surcharge is listed as a separate line item on each customer's standardized UPS receipt, which is generated by the iShip software. Customers, who pay the amount specified in an inflated invoice, rely upon the invoice's implicit representation that the invoiced amount was honestly owed.

34.     UPS's overcharge is deliberate and widespread. UPS controls the amount charged by its retail affiliates by requiring affiliates to process transactions using UPS's proprietary, centralized software platform: iShip. Regardless of whether a package is shipped through a UPS account or through a UPS Third Party Retailer, packages are shipped using the iShip software platform. The iShip software is owned and operated by iShip, Inc., a wholly-owned subsidiary of UPS. UPS intentionally programmed the iShip software to overcharge retail customers on the Delivery Area Surcharge. Indeed, the iShip source code, code documentation, and other UPS internal documents—all available through reasonable discovery—will confirm that the company

explicitly wrote software designed to bilk retail customers. UPS reaffirmed its fraud every year when it adjusted the Delivery Area Surcharge in its Retail Rates but continued to program its iShip software to charge more than the published rates. By deliberately publishing one rate and engineering its software to charge another—higher—rate, UPS exhibited its deliberate intent to defraud retail customers.

35.     UPS uses the mails and wires to perpetuate this fraud. Using the U.S. mail and its own shipping services, UPS sends physical, printed copies of its Retail Rates to each of its Third-Party Retailers and affiliates. UPS similarly sends electronic copies of its Retail Rates to each of its Third-Party Retailers and affiliates via the Internet. Moreover, UPS frequently pushes out electronic updates to its iShip software to each of its Third-Party Retailers and affiliates via the Internet. UPS uses the Internet to send electronic copies of its Retail Rates to retail customers. Finally, UPS uses the wires by offering a shipping calculator tool to estimate shipping costs.[8]

36.     UPS's retail affiliates—which are independently owned companies—are not responsible for the inflated Delivery Area Surcharge. Under the terms of the affiliates' contracts with UPS, the affiliates must use UPS's iShip software to originate UPS shipments. Affiliates are powerless to alter the content of the software or adjust the surcharge.

37.     UPS retains all of the ill-gotten proceeds of the Delivery Area Surcharge overcharge. And while the amount of each overcharge may be small, UPS makes immense sums of money by perpetuating the fraud. Assuming (conservatively) that 2 percent of UPS's 4.7 billion annual total shipments were subject to an inflated charge of (again, conservatively) $2 per charge, UPS would stand to gain a staggering $188 million each year. UPS is required by law to maintain records of its shipping charges. *See* 49 U.S.C. § 14122(c); 49 C.F.R. § 379. UPS's own records will show the precise extent of the overcharges to retail customers.

38.     UPS's inflated surcharge harms its competitors in the shipping industry, who compete against UPS and rely on the truthfulness of UPS's published rates in establishing their own rates. FedEx, like UPS, levies a delivery area surcharge on packages destined for rural

---

[8] *See* https://wwwapps.ups.com/calTimeCost.

areas.[9] But FedEx, unlike UPS, actually follows its own rates in determining the amount owed. By engaging in a bait and switch, UPS engages in unfair business competition with its shipping competitors.

### Plaintiff's Experience Was Typical of Other Retail Customers

39.     Plaintiff Holl's experience was emblematic of the experience of retail customers generally. On June 18, 2016, Plaintiff presented a package for shipment at the UPS Store located at 1083 Vine Street, in Healdsburg, California. The package was to be shipped to Plaintiff's cousin, Annika Holl, who lives at 20206 167th St NW, Big Lake, Minnesota, 55309.

40.     Plaintiff was correctly charged a base rate of $14.06, based on the applicable Ground rate of $10.81 plus a $3.25 charge for shipping to a residential location. Plaintiff, however, was charged a Delivery Area Surcharge of $5.92. Based on UPS's Retail Rates, Plaintiff should have been charged a Delivery Area Surcharge of $3.15. Plaintiff's receipt is reproduced here:



```
Shipment Receipt:        Page #1 of 1
THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

SHIP DATE:                    SHIPMENT INFORMATION:
MON 20 JUN 2016               UPS GROUND RESIDENTIAL
                              1 LBS 15.1 OZ ACTUAL WT
EXPECTED DELIVERY DATE:       2.00 LBS BILLABLE WT
MON 27 JUN 2016 EOD           DIMS: 11.00X8.00X2.00 IN
SHIP FROM:
RANDALL HOLL
268 BAY RIDGE PKWY
BROOKLYN NY 11209
(612) 991-5303                TRACKING NUMBER: 1ZU03806039?257991
                              SHIPMENT ID: MMP6Y1MY95YW0
                              SHIP REF 1: - -
                              SHIP REF 2: - -
SHIP TO:
ANNIKA HOLL                   DESCRIPTION OF GOODS:
20206 167TH ST NW             - -
BIG LAKE MN 55309-9016
RESIDENTIAL
                              SHIPMENT CHARGES:
                              GROUND RESIDENTIAL         14.06
                              SERVICE OPTIONS             0.00
                              FUEL SURCHARGE              0.90
SHIPPED THROUGH:              DELIVERY AREA SURCHARGE     5.92
THE UPS STORE #2566          CHS PROCESSING FEE           0.20
HEALDSBURG CA 95448-4830
(707) 433-0396
                              TOTAL                     $21.08

COMPLETE ONLINE TRACKING:  ENTER THIS ADDRESS IN YOUR WEB BROWSER TO TRACK:
HTTP://THEUPSSTORE.COM. (SELECT TRACKING, ENTER SHIPMENT ID #) SHIPMENT
QUESTIONS? CONTACT SHIPPER THROUGH ABOVE.


SHIPMENTID: MMP6Y1MY95YW0                        The UPS Store
Powered by iShip(r)
06/18/2016 02:20 PM Pacific Time N
```

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

---

[9] *See* http://www.fedex.com/us/2016rates/surcharges-and-fees.html.

41.     Plaintiff paid the amount specified in the inflated invoice, relying upon the invoice's implicit representation that the invoiced amount was honestly owed.

42.     Plaintiff, though his counsel, sent UPS a letter via Certified U.S. Mail on August 31, 2016 providing notice to UPS and setting forth his claims and the claims of the Class.  As of the date of this Complaint, Plaintiff has not received a response to his letter.

## CLASS ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:[10]

> All persons who shipped one or more parcels through UPS's retail affiliates and were charged a Delivery Area Surcharge exceeding the amount listed in UPS's Retail Rates at any time beginning four years prior to the filing of the initial complaint in this action until trial of this action. The class does not include any UPS directors, board members, or executives who otherwise meet the class definition.

44.     This case is a prototypical class action. Certifying this case will vindicate "the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation." *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 659 n.12 (9th Cir. 1977) (citing *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 249 (3d Cir. 1975)). The proposed class satisfies all of the necessary criteria under Rules 23(a) and 23(b)(1) and (3), and a class action is appropriate for the following reasons (among others):

45.     <u>Numerosity</u>:  The Class is so numerous that joinder of all members is impracticable.   UPS systematically imposed inflated Delivery Area Surcharges on retail customers. Based on the available evidence, including UPS's own representation that over 16,000 third-party retail locations exist nationwide, the Class likely contains tens of thousands—if not hundreds of thousands—of people.

---

[10] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification, or in any subsequently amended complaint.

46.   <u>Commonality/Predominance</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to:

    a.  Whether UPS conducted the affairs of an enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, et seq.);

    b.  Whether UPS presented false or misleading information on a document about the actual rate, charge, or allowance to parties to the transactions.

    c.  Whether UPS unjustly enriched itself in violation of federal common law;

    d.  Whether UPS unjustly enriched itself in violation of state common law;

    e.  Whether UPS engineered its iShip software platform to systematically overcharge retail customers the Delivery Area Surcharge;

    f.  Whether UPS used the mail or wires to fraudulently overbill retail customers;

    g.  Whether UPS received a benefit from retail customers that it accepted and retained; and

    h.  The proper measure of damages, restitution, and/or other monetary relief.

47.   <u>Typicality</u>:     Plaintiff's claims are typical of the members of the Class.  Plaintiff was presented with a standardized receipt that listed a Delivery Area Surcharge and paid the amount demanded. Plaintiff's experience is materially identical to that of retail customers who were charged a surcharge.

48.   <u>Adequacy</u>:     Plaintiff will fairly and adequately protect the interests of the Class, and has retained counsel experienced in complex class action litigation.

49.   <u>Superiority</u>:     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of consumer litigation where individual plaintiffs lack the financial resources to vigorously prosecute separate lawsuits in federal court against large corporate defendants.

50.   This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the Class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for UPS.

51.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions only affecting individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  UPS's common and uniform policies and practices resulted in improper overcharges to the Class.  The damages suffered by the individual Class members are small compared to the expense and burden of individual prosecution of this litigation.  In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about UPS's practices.

52.     Plaintiff intends to send notice to all members of the Class to the extent required by Rule 23.  The names and addresses of the members of the Class are available from the UPS's records.

### FIRST CLAIM FOR RELIEF
**Conducting the Affairs of an Enterprise in Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),**
**18 U.S.C. § 1961, *et seq.***

**(Asserted on Behalf of Plaintiff and the Class)**

53.     UPS, by using its network of independently owned and operated affiliates to overcharge and defraud retail customers, conducted the affairs of an enterprise though a pattern of racketeering in violation of RICO.

54.     18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

55.     UPS is a "person" within the meaning of 18 U.S.C. § 1961(3). UPS is "an entity capable of holding legal or beneficial interest in property." *Id.* Indeed, UPS generated $58.4 billion in revenue in 2015, and held much of that revenue in corporate accounts. Moreover, UPS owns a wide variety of real property, including buildings, trucks, and computer systems.

56.     The RICO "enterprise" in this case comprises (1) UPS, (2) The UPS Store, Inc., a subsidiary of UPS, (3) iShip, Inc., a subsidiary of UPS, and (4) UPS's Third Party Retailers,

-16-

including UPS Stores, UPS Authorized Shipping Outlet Locations, and UPS Alliance Locations. These entities, collectively, pursue a common purpose separate and apart from any unlawful racketeering activity. The enterprise exists to create a network of businesses and locations that allow a wide range of consumers to ship parcels around the United States and abroad. Each member's role within the enterprise is defined, in part, through contractual obligations to other members. Relevant here, UPS's Third Party Retailers must execute an extensive contract with UPS and The UPS Store, Inc. setting forth the terms and conditions of the relationship. Those contracts, among other things, set forth the amount of revenue sharing between members of the enterprise. The contracts also require Third Party Retailers to use UPS's iShip shipping software in originating shipments through UPS. The enterprise is marked by a longevity sufficient to permit those associates to pursue the enterprise's purpose. UPS has associated with its network of Third Party Retailers for many years. UPS began its UPS Store franchise program after acquiring Mail Boxes Etc., a chain of 4,300 retail shipping locations, in 2001.[11] UPS also acquired iShip Inc. in 2001.[12]

57.     The RICO enterprise, as defined above, is an enterprise engaged in, or the activities of which affect, interstate or foreign commerce. UPS itself is the world's largest common carrier in interstate and foreign commerce. UPS's subsidiaries—The UPS Store, Inc. and iShip, Inc.—both engage in and affect interstate and foreign commerce. The UPS Store, Inc. facilitates a large network of franchise locations which serve as drop-off and pickup points for parcels traveling in interstate and foreign commerce. iShip, Inc. develops and deploys software designed to use the internet to originate, track, and receive shipments around the world. And UPS's Third Party Retailers broaden UPS's reach to tens of thousands of locations around the United States, and serve as vital hubs for shipping and receiving packages.

58.     Although the members of the enterprise are united in a common purpose, each member of the enterprise is sufficiently distinct to be distinguishable from UPS itself. Outside of the racketeering activity, the constituent members of the enterprise are free in many respects to

---

[11] *See* http://www.forbes.com/2001/03/05/0305ups.html.
[12] *See* https://www.iship.com/About.aspx.

act independently and advance their own interests. As UPS acknowledges, all Third Party Retailers are independently owned and operated businesses. Many UPS Authorized Shipping Outlet Locations are simple Mom and Pop general stores that dot the rural landscape. Even UPS Stores and UPS Alliance Locations, which operate as franchises of UPS, remain free to make a wide range of independent business judgments. All UPS Third Party Retailers can decide for themselves, for example, what kind of items (e.g., boxes, tape) to offer for sale. Third Party Retailers also can decide how to arrange the layout of the stores, how to market the business, whether to hire, fire, or discipline employees, and when to open and close the store, among many other business decisions. iShip Inc. sells its services to a wide range of companies in the shipping industry.[13]

59.     UPS *conducts or participates, directly or indirectly*, in the conduct of the affairs of the enterprise through a pattern of racketeering activity. In imposing the inflated Delivery Area Surcharge, UPS exercises a managerial role in the enterprise's affairs. UPS requires its Third Party Retailers to use UPS's iShip software. The iShip software dictates the amount charged for any shipment sent via UPS. Through the iShip software, which UPS specifically engineers to overcharge retail customers, UPS forces its Third Party Retailers to overcharge retail customers for the Delivery Area Surcharge. UPS's Third Party Retailers are not free to negotiate this bargain. They are required by UPS to use the iShip software on an as-is basis according to their contracts with UPS and The UPS Store, Inc.

60.     In addition, UPS conducts and participates, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of *racketeering activity*. The racketeering activity at issue in this case encompasses two constituent parts: (1) mail fraud and (2) wire fraud. Mail fraud and wire fraud contain the same three elements, differing only in the medium of communication. The elements are: (1) a scheme to defraud; (2) use of the mails or wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud. *See* 18 U.S.C. § 1341; 18 U.S.C. § 1343; *United States v. French*, 748 F.3d 922, 935 (9th Cir. 2014); *United States v. Garlick*, 240 F.3d

---

[13] *See* https://www.iship.com/Solutions.aspx.

789, 792 (9th Cir. 2001); *United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988). Each use of the mail or wires constitutes a separate violation of the relevant statute. *Garlick*, 240 F.3d at 792. "In general, to be in furtherance of a scheme, the charged mailing or wire transmission need not be an essential element of the scheme, just a 'step in the plot.' " *Id.* at 795 (quoting *Schmuck v. United States*, 489 U.S. 705, 711 (1989)). "Mail or wire fraud can take the form of (1) a scheme or artifice to defraud, or (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003) (citing *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981)). "[I]ntent to defraud may be established by circumstantial evidence." *See, e.g.*, *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990).

61.     UPS engaged in a scheme to defraud retail customers through an inflated Delivery Area Surcharge. UPS consistently charged retail customers an inflated Delivery Area Surcharge on transactions originated at UPS's Third Party Retailers. To accomplish this scheme, UPS intentionally programmed UPS's iShip software to charge the inflated surcharge whenever a customer originated a shipping transaction from the Third Party Retailer. Further proof of the scheme lies in the iShip source code, code documentation, and other internal documents available in discovery describing the scheme and its implementation. By creating software engineered to overcharge retail customers, UPS engaged in a scheme or artifice to defraud those customers. And by representing on standardized receipts that the inflated charge was owed, UPS obtained money through false and fraudulent pretenses.

62.     UPS used, and continues to use, both the mails and the wires in furtherance of the scheme. Using the U.S. mail and its own shipping services,[14] UPS sends physical, printed copies of its Retail Rates to each of its Third-Party Retailers and affiliates. UPS similarly sends electronic copies of its Retail Rates to each of its Third-Party Retailers and affiliates via the Internet. Moreover, UPS frequently pushes out electronic updates to its iShip software to each of

---

[14] The mail fraud statute covers both use the U.S. mail as well as the use of private carriers such as UPS. *See* 18 U.S.C. § 1341 (statute covers any person who "deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier").

its Third-Party Retailers and affiliates via the Internet. UPS also uses the Internet to send electronic copies of its Retail Rates to retail customers. UPS's rates are available on UPS's website at https://www.ups.com/content/us/en/shipping/cost/zones/. Finally, UPS uses the wires by offering a shipping calculator tool to estimate shipping costs.[15] Each of these activities independently constitutes a crucial step in UPS's scheme to overcharge retail customers.

63.    At all relevant times, UPS acted with a specific intent to deceive or defraud retail customers. Every step of the scheme occurred as a result of UPS's specific intent to list one Delivery Area Surcharge in its Retail Rates and charge another—higher—rate. UPS deliberately listed specific amounts to be charged for the Delivery Area Surcharge in its Retail Rates. At the same time, UPS intentionally programmed the iShip software to charge retail customers a different, inflated surcharge, as documents available in discovery will demonstrate. The inflated charge was not (and is not) a computer glitch. Rather, the inflated charge was specifically implemented with the intention of overcharging retail customers. What is more, UPS modifies its rates, including the operative Delivery Area Surcharge, at least once every year. Each of these rate changes requires a parallel change in UPS's shipping software to effectuate the change in rate. Yet, year after year, UPS has continued to overcharge retail customers for the Delivery Area Surcharge. UPS's decision to continue overcharging customers when it modified its rates provides further evidence of UPS's intent to defraud. Internal documents, including the iShip source code, code documentation, emails, and other internal documents will further demonstrate that UPS deliberately and intentionally overcharged retail customers.

64.    UPS conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a *pattern* of racketeering activity. A plaintiff may show a pattern by alleging circumstances indicating that the predicate acts are part of the offender's regular way of conducting business. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). In order to show a pattern, the plaintiff "must demonstrate that the alleged predicate acts were both *related* and *continuous*." *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers*

---

[15] *See* https://wwwapps.ups.com/calTimeCost.

*Union, Local 996*, 302 F.3d 998, 1011 (9th Cir. 2002) (emphasis added). To establish predicate acts that are *related*, a RICO plaintiff need only show that the predicate acts "have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *See H.J.*, 492 U.S. at 240. "*[C]ontinuity*," in turn, is "both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241 (emphasis added).

65.     Here, UPS's predicate acts are both related and continuous. With respect to the relatedness element, each time UPS used the mails and wires as described above, the conduct occurred for the same or similar purposes (gaining illicit profits through inflating the Delivery Area Surcharge), involved the same participants (UPS, its subsidiaries, and its retail affiliates), victims (retail customers), and methods of commission (engineering the iShip software to overcharge retail customers, and using the mails and wires to perpetuate the fraudulent scheme), and brought about the same results (defrauding and overcharging retail customers).

66.     Moreover, UPS's racketeering activity is continuous. UPS has imposed the inflated Delivery Area Surcharge since 1999. And by engineering the iShip software to complete the overcharge, UPS engages in the racketeering activity on a constant—indeed daily—basis. UPS's conduct satisfies both the "closed and open-ended concept[s]," either of which is sufficient to demonstrate a pattern of racketeering activity. UPS's racketeering activity has stretched continuously over a period spanning many years. And there are no signs that UPS has stopped imposing the inflated surcharge; by its nature, UPS's conduct "projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241. In short, using the mails and wires to perpetuate the assessment and collection of the inflated charge is a crucial part of UPS's regular and ongoing way of conducting business.

67.     18 U.S.C. § 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may" bring a civil action seeking redress.

68.     Plaintiff and the class members are "person[s]" within the meaning of 18 U.S.C. § 1964(c) and 18 U.S.C. § 1961(3). Plaintiff is a natural person "capable of holding legal or

-21-

beneficial interest in property." *Id.* Class members are natural persons, businesses, non-profits, government agencies—all "entit[ies] capable of holding legal or beneficial interest in property." *Id.*

69.    Plaintiff and the class members have sustained injuries to their business or property. As a result of being overcharged for the Delivery Area Surcharge, Plaintiff and the class have suffered precisely the sort of concrete financial loss contemplated by Section 1964(c). *See Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992); *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).

70.    Finally, Plaintiff and the class members have sustained injuries *by reason of* UPS's racketeering activity. "To maintain a cause of action under RICO, a plaintiff must show not only that the defendant's violation was a 'but for' cause of his injury, but that it was the proximate cause as well." *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir. 1994) (citing *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Both elements—but-for and proximate cause—are present here. UPS explicitly implemented an inflated Delivery Area Surcharge to overcharge retail customers. By advertising one rate and charging another—and using the mails and wires to disseminate both its rates and shipping software—UPS directly caused injuries to Plaintiff and the class members. Absent UPS's fraudulent conduct, retail customers would have paid only the Delivery Area Surcharge listed in UPS's rates.

71.    "[A] plaintiff asserting a RICO claim predicated on mail [or wire] fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008). Reliance is simply one category of proof that "may in some cases be sufficient to establish proximate cause . . . [however] there is no sound reason to conclude that such proof is always necessary." *Id.* at 89. Although a showing of reliance is not required, Plaintiff and the class members relied on UPS's misrepresentations. UPS's iShip software generates a standard receipt listing the inflated Delivery Area Surcharge which is presented to retail customers, including Plaintiff and the class members. Payment of the inflated charge raises the common inference that customers—like Plaintiff and the class members—"who pay the

-22-

amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." *See In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 120 (2d Cir. 2013). *Accord CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1090-92 (10th Cir. 2014); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 58 (1st Cir. 2013); *Klay v. Humana*, 382 F.3d 1241, 1258-59 (11th Cir. 2004).

72.     As a direct and proximate result of the UPS's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and the class members have suffered damages. Damages can be measured by calculating the difference between the surcharge listed in UPS's rates and the surcharge actually assessed.

**LEGAL FRAMEWORK GOVERNING PLAINTIFF'S REMAINING CLAIMS**

73.     Common carriers like UPS have long been regulated by a regime at the intersection of state and federal common law and federal statutes. A brief overview of the history of common carrier regulation provides important context to the other claims raised here.

74.     Before federal statutory regulation, rules governing the conduct and liability of common carriers were "dictated by federal and state common law." *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997) (citing *York Co. v. Central R.R.*, 70 U.S. 107 (1865), *Hart v. Pennsylvania R.R. Co.*, 112 U.S. 331 (1884)). Common law rules, developed by courts incrementally, governed all aspects of common carriers' conduct. *See generally* 2 Robert Hutchinson *et al.*, *A Treatise on the Law of Carriers, as Administered in the Courts of the United States and England* (3d ed. 1906). These common law principles embraced the rule that a common carrier is liable when the carrier charges more than its published rate. *See id.* § 804 (citing cases).

75.     In the 1870s, states, concerned about the growing power and influence of railroads, sought to assert greater regulation and control of the rail industry. *See, e.g.*, Frank Norris, *The Octopus* (1901); Ida M Tarbell, *The History of the Standard Oil Company* (1904). For a period of time, the Supreme Court permitted states to continue regulating common carriers. *See, e.g.*, *Munn v. Illinois*, 94 U.S. 113, 135-36 (1877). But by 1886, the Supreme Court reversed course. In

-23-

*Wabash, St. L. & P. Ry. Co. v. State of Illinois*, 118 U.S. 557, 576-77 (1886), the Court overruled *Munn* and held that the regulation of rates levied by common carriers was a matter of exclusive federal control. *Id.* "The result of this decision was to place rates for interstate transportation beyond State power of regulation." *See Federal Common Law and Interstate Commerce*, 9 Colum. L. Rev. 375, 393 (1909).

76.     The Supreme Court's decision in *Wabash* led to the enactment of the Interstate Commerce Act of 1887 ("ICA"), ch. 104, 24 Stat. 379 (codified as amended in scattered sections of 49 U.S.C.). The Act required rail carriers to charge rates that are "reasonable and just," broadly forbade price discrimination, and created the Interstate Commerce Commission to enforce the law. *Id.* §§ 1-5, 11. The ICA provided a private right of action, *id.* § 9, and preserved all pre-existing remedies, stating that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute." *Id.* § 22.

77.     Relevant here, the ICA codified the common law rule requiring carriers to adhere to their published rates:

> [W]hen any such common carrier shall have established and published its rates, fares, and charges . . ., it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force.

*Id.* § 6.

78.     Following *Wabash* and the passage of the ICA, courts confronted a pressing question: in light of *Wabash*, if Congress had not spoken to a specific question bearing on a common carrier's duties in interstate commerce, did *federal common law* fill the gap? Lower courts divided sharply on the question. *Compare Murray v. Chicago & N.W. Ry. Co.*, 62 F. 24, 34 (N.D. Iowa 1894) ("The failure of congress to legislate can be construed only as an intention not to disturb what already exists; and as, at the time of the adoption of the constitution, common carriers, under the principles of the common law, were subject to certain duties and obligations, the failure on the part of congress to legislate thereon evinces the legislative intent to leave the rules and principles of the common law in full force, as controlling and defining the relations,

duties, and obligations of common carriers engaged in interstate commerce."), *with Gatton v. Chicago, R.I. & P. Ry. Co.*, 63 N.W. 589, 596 (Iowa 1895) ("There is no federal common law, which pervades the Union, and constitutes a rule of judicial action.").

79.     The Supreme Court resolved the question in *Western Union Telegraph Co. v. Call Publishing Co.*, 181 U.S. 92 (1901), holding that federal common law operated as a uniform background principle governing the conduct of common carriers in the absence of specific legislation from Congress. *Id.* at 99-103. As the Supreme Court explained,

> There is no body of Federal common law separate and distinct from the common law existing in the several states, in the sense that there is a body of statute law enacted by Congress separate and distinct from the body of statute law enacted by the several states. But it is an entirely different thing to hold that there is no common law in force generally throughout the United States, and that the countless multitude of interstate commercial transactions are subject to no rules and burdened by no restrictions other than those expressed in the statutes of Congress.

*Id.* at 101. Reasoning that prior to the enactment of the ICC, "railway traffic in this country was regulated by the principles of the common law applicable to common carriers," *id.* at 102 (citing *Interstate Commerce Commission v. Baltimore & O. R. Co.*, 145 U. S. 263, 275 (1892)), the Court held that "the principles of the common law are operative upon all interstate commercial transactions, except so far as they are modified by congressional enactment." *Id. See generally* Hundson Carey, *Federal Common Law*, 10 Va. L. Reg. 475 (1904).

80.     In the early Twentieth Century, Congress acted to broaden the scope of the ICA and strengthen the regulatory authority of the ICC. *See* Elkins Act of 1903, ch. 708, 32 Stat. 847 (1903); Hepburn Act, ch. 3591, 34 Stat. 584, (1906); Mann-Elkins Act, ch. 309, 36 Stat. 539 (1910). For the first time, Congress required all common carriers subject to the Act to file their rates with the ICC. *See Mottley v. Louisville & N R Co.*, 150 F. 406, 408 (W.D. Ky. 1907). Under the so-called filed rate doctrine, any rate actually charged by a common carrier that deviated from the filed rate was deemed per se unlawful. *See, e.g.*, *Kansas City Southern Ry. v. Carl*, 227 U.S. 639 (1913); *Poor v. Chicago, B & Q Ry.*, 12 I.C.C. 418, 421-25 (1907).

81.     In 1935, Congress passed the Motor Carrier Act, amending the ICA to include truck companies as common carriers, and subjecting motor carriers to the same regulatory scheme

-25-

1  applied to railroads—including adhering to filed rates. Motor Carrier Act of 1935, ch. 498, 49

2  Stat. 543 (1935).

3        82.    In 1980, Congress began deregulating, eliminating the filed-rate doctrine but

4  retaining the requirement that carriers honor their published rates. The Motor Carrier Act of 1980,

5  Pub. L. No. 96-296, 94 Stat. 793, liberalized rate making, eliminated restrictions on certain cargo,

6  and deregulated routes and regions. *Id.* Congress retained the filed-rate doctrine, however, along

7  with the requirement that a "carrier providing transportation or service subject to the jurisdiction

8  of the [ICC] . . . shall provide that transportation or service only if the rate for the transportation

9  or service is contained in a tariff . . . ." 49 U.S.C. § 10761(a) (1990); *Maislin Industries U.S., Inc.*

10  *v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990). The Trucking Industry Regulatory Reform Act

11  of 1994, Pub. L. No. 103–311, 108 Stat. 1673, and ICC Termination Act of 1995, Pub. L. No.

12  104-88, 109 Stat. 803, finally eliminated the filed-rate doctrine (except in narrow circumstances

13  not at issue here). *See OneBeacon Ins. Co. v. Haas Industries, Inc.*, 634 F.3d 1092, 1099 (9th Cir.

14  2011). In place of the filed-rate doctrine, however, Congress enacted a revised truth-in-billing

15  regime, requiring carriers to "provide . . . to the shipper, on request of the shipper, a written or

16  electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a

17  shipment, or agreed to between the shipper and the carrier, is based." ICC Termination Act of

18  1995, Pub. L. No. 104–88, 109 Stat. 803, 907–10 (codified at 49 U.S.C. § 14706(c)(1)(B)).

19  Congress further required that "No person may cause a motor carrier to present false or

20  misleading information on a document about the actual rate, charge, or allowance to any party to

21  the transaction." 49 U.S.C. § 13708(b).

22        83.    Finally, Congress acted to preempt certain state laws regulating transportation,

23  providing that "a State . . . may not enact or enforce a law . . . related to a price, route, or service

24  of any motor carrier . . . with respect to the transportation of property." Federal Aviation

25  Administration Authorization Act of 1994, 108 Stat. 1605–1606 (codified at 49 U.S.C. §

26  14501(c)(1)). The preemptive language forbids suits based on alleged "violation[s] of state-

27  imposed obligations[,]" but does not foreclose state law claims alleging a breach of the carrier's

28  "own self-imposed undertakings." *See American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228

1  (1995). Congress retained the ICC's provision preserving common law remedies. *See* 49 U.S.C. §

2  13103.

3      84.     Both before and after deregulation, courts have continued to look to *federal*

4  *common law* to fill gaps left open by Congress in the regulation of common carriers. *E.g.*, *Deiro*

5  *v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir. 1987); *Klicker v. Northwest Airlines,*

6  *Inc.*, 563 F.2d 1310, 1315 (9th Cir. 1977); *Sam L. Majors Jewelers*, 117 F.3d at 926-27. "The

7  federal common law applicable to carriers was not changed with the advent of regulation of . . .

8  carriers." *Deiro*, 816 F.2d at 1365 (citing *First Pennsylvania Bank v. Eastern Airlines, Inc.*, 731

9  F.2d 1113, 1117 (3d Cir. 1984); *Klicker*, 563 F.2d at 1314). Thus, where Congress has left a

10  legislative gap, federal common law continues to regulate the conduct of interstate shippers and

11  common carriers.

12  ### SECOND CLAIM FOR RELIEF
   **Providing False or Misleading Information in Violation of the**
13  **Interstate Commerce Act 49 U.S.C. § 13708(b)**

14  **(Asserted on Behalf of Plaintiff and the Class)**

15      85.     49 U.S.C. § 13708(b) provides that "[n]o person may cause a motor carrier to

16  present false or misleading information on a document about the actual rate, charge, or allowance

17  to any party to the transaction."

18      86.     49 U.S.C. § 14704(a)(2) provides that "[a] carrier or broker providing

19  transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained

20  by a person as a result of an act or omission of that carrier or broker in violation of this part." This

21  provision creates a private right of action. *See Fulfillment Services Inc. v. United Parcel Service,*

22  *Inc.*, 528 F.3d 614, 620 (9th Cir. 2008).

23      87.     UPS is "person" within the meaning of 49 U.S.C. § 13708(b). Under settled

24  agency principles, UPS is also vicariously liable for the conduct of its employees, who are also

25  "person[s]" within the meaning of 49 U.S.C. § 13708(b).

26      88.     UPS is a motor carrier within the meaning of 49 U.S.C. § 13708(b).

27      89.     UPS caused itself to present false or misleading information on documents about

28  the actual rate for the Delivery Area Surcharge to Plaintiff and the class members. By

-27-

programming the iShip software to inflate the surcharge, and by presenting retail customers with a standardized receipt showing the inflated charge, UPS presented false and misleading information to retail customers. Similarly, the management level UPS employees who ordered the iShip software modified to charge the inflated surcharge caused UPS to present false and misleading information to retail customers through standardized receipts showing the inflated charge.

90.     Plaintiff and the class members have sustained damages as a result of UPS's actions. Plaintiff and the class members are entitled to the difference between the published surcharge and the assessed surcharge.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment Due to Failure to Adhere to Published Rates**
**in Violation of Federal Common Law**

**(Asserted on Behalf of Plaintiff and the Class)**

91.     "Liability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant." Restatement (Third) of Restitution and Unjust Enrichment § 39(1) (2010); *See Stone v. White*, 1937 301 U.S. 532, 534 (1937) (citing The History of Assumpsit, 2 Harv. L. Rev. 53; Woodward, Law of Quasi-Contracts, s 2.); 1 G. Palmer, Restitution §§ 1.2, 2.2–2.3 (1978).

92.     By overcharging retail customers for the Delivery Area Surcharge, UPS has received a benefit whose retention without payment would result in the unjust enrichment of UPS at the expense of the Plaintiff and the class members.

93.     Under federal common law principles, a common carrier may not charge customers an amount exceeding the carrier's published rate. *See* 2 Robert Hutchinson *et al.*, *A Treatise on the Law of Carriers, as Administered in the Courts of the United States and England* § 804 (3d ed. 1906). By charging more than its published rate, UPS has caused damage to Plaintiff and the class.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment Due to Failure to Adhere to Published Rates**
**in Violation of State Common Law**

**(Asserted on Behalf of Plaintiff and the Class)**

-28-

94.     Under state law principles of unjust enrichment, a person may not receive a benefit and unjustly retain that benefit at the expense of another. *See, e.g.*, *Elder v. Pac. Bell Tel. Co.*, 141 Cal.Rptr.3d 48, 61 (Cal. App. 2012). "Courts have recognized that state claims of unjust enrichment are universally recognized causes of action that are materially the same throughout the United States." *Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (citation and internal quotations omitted); *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007), *rev'd on other grounds*, 2009 WL 826842 (3d Cir. 2009) ("Although there are numerous permutations of the elements of the [unjust enrichment] cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched.").

95.     By overcharging retail customers for the Delivery Area Surcharge, UPS has received a benefit whose retention without payment would result in the unjust enrichment of UPS at the expense of the Plaintiff and the class members. By charging more than its published rate, UPS has caused damage to Plaintiff and the class.

96.     Federal law does not preempt state law unjust enrichment claims in this circumstance because the claim seeks a remedy for a breach of the carrier's "own self-imposed undertakings." *See Wolens*, 513 U.S. at 228; *Solo v. United Parcel Service Co.*, 819 F.3d 788, 798 (6th Cir. 2016) (suggesting that unjust enrichment claim predicated on UPS's failure to honor its own terms not preempted).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class members, prays for relief as follows:

A.     Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as the representative of the Class, and Plaintiff's counsel as Class Counsel;

C.     Recovery of economic damages sustained due to UPS's inflated surcharge;

D.     Restitution of all amounts improperly obtained as a result of UPS's unjust and unlawful scheme;

-29-

E.      Treble damages pursuant to 18 U.S.C. § 1964(c);

F.      Attorneys' fees and costs of suit;

G.      Pre-judgement interest; and

H.      Such other relief as the Court may deem just and proper.

Dated: October 11, 2016                          **NICHOLS KASTER, LLP**

                                      By:     /s/ *Matthew C. Helland*
                                              Matthew C. Helland

                                      Attorney for Plaintiff and the Class