Matthew C. Helland, CA State Bar No. 250451
NICHOLS KASTER, LLP
One Embarcadero Center, Suite 720
San Francisco, CA 94111
Telephone: (415) 277-7235; Facsimile: (415) 277-7238
helland@nka.com

Adam W. Hansen, CA State Bar No. 264241
APOLLO LAW, LLC
400 South 4th Street, Suite 401M – 250
Minneapolis, MN  94415
Telephone: (612) 927-2969; Facsimile: (419) 793-1804
adam@apollo-law.com

Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
  * admitted pro hac vice
NICHOLS KASTER, PLLP
4600 IDS Center, 80 S. Eighth Street
Minneapolis, MN 55402
Telephone: (612)256-3278; Facsimile: (612) 338-4878
krichter@nka.com
bspecht@nka.com

Attorneys for Plaintiff and the Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Randall Holl, individually, on behalf of others similarly situated, and as a representative of the class,<br><br>          Plaintiff,<br><br>v.<br><br>United Parcel Service, Inc.,<br><br>          Defendant. | Case No. 3:16-cv-05856-HSG<br><br>**PLAINTIFF RANDALL HOLL'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

    I.     UPS's Business ...............................................................................................2

    II.    UPS's Daily and Retail Rates ........................................................................3

    III.   UPS's Inflated Delivery Area Surcharge .......................................................3

    IV.   The Alleged "My Choice" Service Agreement .............................................4

    V.    Plaintiff's Shipment .......................................................................................6

    VI.   Plaintiff's Claims ...........................................................................................6

LEGAL STANDARDS ........................................................................................................6

    I.     Standard for Determining Whether an Arbitration Agreement Exists ...........6

    II.    Rules of Contract Formation .........................................................................7

ARGUMENT ....................................................................................................................12

    I.     Plaintiff Did Not Agree to Arbitrate His Shipping Dispute When He Allegedly

          Signed Up for UPS's My Choice Service ...................................................12

          A.    UPS's Arbitration Provision Is Fatally Inconspicuous ...................12

          B.    UPS's Arbitration Provision Is Neither Plain nor Clear .................16

          C.    UPS Did Nothing To Bring the Arbitration Provision to the Attention of

                Consumers .......................................................................................18

          D.    UPS Provides an Insufficient Evidentiary Basis To Compel Arbitration

                Based on Plaintiff's Alleged Enrollment in UPS's My Choice Service ...20

    II.    Plaintiff Did Not Agree to Arbitrate His Shipping Dispute When He Tendered

          His Package, and Equitable Estoppel is Inapplicable ...................................20

CONCLUSION .................................................................................................................24

Case No. 3:16-cv-05856-HSG

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

**Cases**

*Applied Energetics, Inc. v. New Oak Capital Mkts., LLC*, 645 F.3d 522 (2d Cir. 2011) ............7

*AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643 (1986) ...................5

*Azrak v Panama Canal Co.*, 117 F. Supp. 334, 336 (S.D.N.Y. 1953) ...........................16

*Banner Entertainment, Inc. v. Superior Court*, 62 Cal.App.4th 348 (1998) ...................7

*Bauer v. Jackson*, 15 Cal.App.3d 358 (4th Dist. 1971) .....................................8

*Begonja v. Vornado Realty Trust*, 159 F.Supp.3d 402 (S.D.N.Y. 2016) .......................7

*Berkson v. Gogo LLC*, 97 F.Supp.3d 359 (E.D.N.Y. 2015) .......................11, 12, 16, 19

*Bruni v. Didion*, 160 Cal.App.4th 1272 (4th Dist. 2008) ...................................8

*California State Auto. Asso. Inter-Insurance Bureau v Barrett Garages, Inc.*,
        257 Cal App 2d 71 (1st Dist. 1967) ...............................................10

*Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal.App.3d 632 (1986) .........................14

*Clark v. Cty. of Tulare*, 755 F. Supp. 2d 1075 (E.D. Cal. 2010) ...........................21

*Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 158 Cal.App.4th 1061 (2008) .........22

*DMS Services Inc. v. Superior Court*, 205 Cal.App.4th 1346 (2012) ..........................23

*Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7 (2d Cir. 1995) ...............................10

*F. P. Baugh, Inc. v. Little Lake Lumber Co.*, 297 F.2d 692 (9th Cir. 1961) .................7, 8

*Fields v. Blue Shield of California*, 163 Cal.App.3d 570 (1985) ............................9

*Fischer v. First Intl. Bank*, 109 Cal.App.4th 1433 (App. 4th Dist. 2003) ...................8

*Freeman v. State Farm Mut. Auto. Ins. Co.*, 14 Cal.3d 473 (1975) ..........................7

*Fritz v. Old Am. Ins. Co.*, 354 F.Supp. 514 (S.D. Tex. 1973) ............................9, 10

*Goldman v. KPMG LLP*, 173 Cal.App.4th 209 (2009) ..........................................21

*Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 819 n.16 (1981) .............................8

*Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287 (2010) .......................6, 7

*Gray v. Zurich Ins. Co.*, 65 Cal.2d 263 (1966) ............................10, 15, 18, 19

*Haynes v. Farmers Ins. Exchange*, 32 Cal.4th 1198 (2004) .............8, 9, 10, 15, 18, 19

*India Paint Co. v. United Steel Prod. Corp.*, 123 Cal.App.2d 597 (1954) .............10, 15

*Jauregui v. Mid–Century Ins. Co.*, 1 Cal.App.4th 1544 (1991) .................................9

*JSM Tuscany, LLC v. Super. Ct.*, 193 Cal.App.4th 1222 (2011) ....................18, 22

*Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014) ........................18

*La Bourgogne*, 144 F. 781 (2d Cir. 1906) ....................................................10, 18

*Los Angeles Inv. Co. v. Home Savings Bank of Los Angeles*, 180 Cal. 601 (1919) ...............9, 10

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,

    89 Cal.App.4th 1042 (2001) ........................................................................8

*May Hosiery Mills v. G.C.Hall & Son*, 77 Cal. 291 (1926) ........................10, 15

*McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*,

    339 F.3d 1087 (9th Cir. 2003) ..................................................................23

*McQueen v. Tyler*, 61 Cal.App.2d 263 (1943) ............................................10

*Meyer v. Kalanick*, --- F.Supp.3d ----,

    No. 15 Civ. 9796, 2016 WL 4073012 (S.D.N.Y. July 29, 2016) ..............11, 16, 18, 19

*Moreing v. Weber*, 3 Cal.App.14 (3d Dist. 1906) ........................................17

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ..............7, 8, 11, 16

*Nielsen v. Swanberg*, 99 Cal.App.270 (1st Dist. 1929) ................................17

*NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64 (2000) ..................24

*O'Connell v Norwegian Caribbean Lines, Inc.*, 639 F Supp 846 (N.D. Ill. 1986) .........16

*Parr v. Superior Court*, 139 Cal.App.3d 440 (1st Dist. 1983) ........................8

*Penilla v. Westmont Corporation*, 3 Cal.App.5th 205, 2016 WL 4709888 (2d Dist. 2016) .........9

*Perdue v. Crocker National Bank*, 38 Cal. 3d 913 (1985) ..............................8

*Ponder v. Blue Cross of Southern California*, 145 Cal.App.3d 709 (1983) ........15

*Ramirez v. Superior Court*, 103 Cal.App.3d 746 (1st Dist. 1980) ....................8

*Raulet v. Northwestern etc. Ins. Co.*, 157 Cal. 213 (1910) ........................10, 18

*Register.com, Inc. v. Verio*, 356 F.3d 393 (2d Cir. 2004) ............................11

*Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010) ............................6

*Roberts v. Fidelity & Cas. Co. of New York*, 452 F.2d 981 (9th Cir. 1971) ........10

*Sandquist v. Lebo Automotive, Inc.*, 1 Cal. 5th 233 (2016) ............................8

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) ............................................. 7, 8, 20

*Scott's V.F. Exch. v. Growers Refrig. Co.*, 81 Cal.App.2d 437 (1947) ........................... 10, 15

*Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016) ...................................... 10, 19

*Siefer v. United Parcel Service, Inc.*,

      No. 212-2012-CV-00210, 2013 WL 8434806 (N.H. Super. Jan. 23, 2013) ................. 3

*Silvestri v Italia Societa Per Azioni Di Navigazione*, 388 F.2d 11 (2d Cir. 1968) ...... 10, 11, 16, 19

*Smith v North German Lloyd S.S. Co.*, 151 F 222 (2d Cir. 1907) ................................... 16

*Smith v. Westland Life Ins. Co.*, 15 Cal.3d 111 (1975) ................................................. 9

*Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) ............................. 24

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) ...................... 7, 8, 9, 19

*State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal.3d 193 (1973) ............................... 9

*Steven v. Fidelity & Casualty Co.*, 58 Cal.2d 862 (1962) ............................... 9, 10, 18, 19

*Tarr Technology Consulting LLC v. United Parcel Service, Inc.*,

      No. 6533012012, 2013 WL 9675800 (N.Y.Sup. Dec. 2, 2013) ......................... 3

*The Majestic*, 166 U.S. 375 (1897) ....................................................................... 10

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053 (9th Cir. 2004) ........... 24

*United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) ......................................... 7

*Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002) .................................... 9

*Wash. Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906 (2001) ................................. 7

*Wheeler v. St. Joseph Hospital*, 63 Cal.App.3d 345 (1976) ............................. 9, 10, 19

*Wilson v. Crown Transfer etc. Co.*, 201 Cal. 701 (1927) .......................................... 10

*Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App.3d 987 (1972) .......... 8, 9, 10, 15

**Rules and Statutes**

2 Williston on Contracts 4th, § 6:47 ..................................................................... 8

9 U.S.C. § 3 ................................................................................................... 24

14 Cal. Jur.3d Contracts ............................................................................ 8, 17

18 U.S.C. § 1961 *et seq.* ........................................................................ 6, 21, 22

49 U.S.C. § 13101, *et seq.* ...................................................................... 6, 21, 22

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

Am. Jur. 2d, Contracts § 263 .................................................................................................8

Fed. R. Evid. 602 ........................................................................................................................*20*

Fed. R. Evid. 801-802 ...............................................................................................................*20*

**<u>Other Authority</u>**

2 Robert Hutchinson *et al.*, *A Treatise on the Law of Carriers, as Administered in the Courts of the United States and England* § 804 (3d ed. 1906) ..........................................................23

Juliet M. Moringiello, *Signals, Assent, and Internet Contracting*,

     57 Rutgers L. Rev. 1307, 1334–40 (2005) ..................................................................9

Juliet M. Moringiello and William L. Reynolds, *From Lord Coke to Internet Privacy: The Past, Present, and Future of the Law of Electronic Contracting*, 72 Md. L. Rev. 452, 460 (2013) .......11

Kessler, *Contracts of Adhesion*, 43 Colum. L. Rev. 629, 637 (1943) .........................10, 19

Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* 111 (2013) .................19

**INTRODUCTION**

The Court should not compel arbitration in this case for the simple reason that there is no binding agreement to arbitrate the present dispute. Under longstanding principles of contract law, terms in an adhesion contract limiting the legal rights of the offeree must reasonably communicate to the offeree that such limitations are a part of the agreement. The convoluted series of documents that UPS attempts to string together utterly fail to satisfy this standard.

UPS attempts to impose an arbitration clause from the "UPS Tariff/Terms and Conditions of Service" (UPS Tariff), a set of terms that govern shipping contracts between UPS and persons entering into shipping contracts with UPS. But by UPS's own admission, Plaintiff is not a party to any such contract with UPS because Plaintiff shipped his package through a "UPS Store," an independent, third-party franchise. In such circumstances, UPS regards the independent UPS Store franchise as the "shipper," and routinely disavows any contractual obligation to the customer presenting the package for shipment at the store.

Recognizing that the UPS Tariff does not apply to Plaintiff directly, UPS nevertheless contends that Plaintiff's alleged enrollment in the "UPS My Choice" service constituted an agreement to arbitrate this dispute. But the UPS My Choice Service Terms in effect at the time Plaintiff allegedly enrolled made no mention of arbitration, or any other form of dispute resolution. (UPS has since altered those terms to include a reference to arbitration.) In fact, a person enrolling in the My Choice service was first presented with another document, a Technology Agreement, which unambiguously states that disputes would be resolved in *state or federal court*—except for disputes arising in the Middle East, which were explicitly subject to arbitration. Moreover, the UPS My Choice Service Terms are explicitly limited to "use of UPS My Choice services"—services related to *receiving* packages—and nothing in the terms suggests they apply to the separate act of shipping a package. Accordingly, no reasonable consumer enrolling in the My Choice service would have understood that he or she was agreeing to arbitration, much less arbitration of disputes unrelated to use of the My Choice service.

Alternatively, UPS invokes the doctrine of "equitable estoppel," claiming that even though Plaintiff is not a party to the UPS Tariff, the retailer that shipped his package was, and therefore

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

Plaintiff is equitably bound by the arbitration clause in the UPS Tariff. But equitable estoppel is a particularly narrow doctrine, and applies only to claims based on breaches of the contract containing the arbitration provision. Here, Plaintiff asserts no claim for breach of contract. He instead asserts two claims arising under federal statutes and two claims sounding in equity, none of which depend upon the obligations imposed under UPS's contract with its retailers. Equitable estoppel does not apply to such claims.

In short, there is no agreement to arbitrate this dispute, and UPS's failure to reasonably communicate the existence of such a purported agreement (in a clear and conspicuous manner) dooms the present motion. In the absence of such an agreement, equity does not compel Plaintiff to arbitrate his claims. To the contrary, it would be manifestly *in*equitable to compel Plaintiff to arbitrate his claims in the absence of a binding agreement to arbitrate. Accordingly, Plaintiff respectfully requests that the Court deny UPS's motion to compel arbitration.

## BACKGROUND

### I.   UPS's Business

Defendant United Parcel Service (more commonly known as UPS) is the world's largest package delivery company. (Compl. ¶ 11.) UPS engages with customers in two different ways: as institutional customers and as retail customers. (Compl. ¶ 12.) To become an institutional customer, the customer must sign up for a UPS account. (Compl. ¶ 12.) Consumers can also use UPS's services through UPS's retail program. (Compl. ¶ 13.) To do so, customers may ship a package with UPS through one of UPS's retail affiliates (or as UPS calls them, "Third Party Retailers"). (Compl. ¶ 13.) UPS's Third Party Retailers include UPS Stores, UPS Authorized Shipping Outlet Locations, and UPS Alliance Locations. (Compl. ¶ 13.)

UPS's Third Party Retailers "are not agents of UPS." (Compl. ¶ 18.) Nor are they agents of retail customers, or retail customers themselves. (Compl. ¶ 18.) UPS regards these Third Party Retailers as the "Shipper of the Package." (Compl. ¶ 18.) UPS makes clear that it will deal solely with Third Party Retailers—not consumers—as the "Shipper[s]." (Compl. ¶ 18.) UPS makes similarly clear that UPS does not regard retail customers as its customers at all, and therefore such customers, according to UPS, must deal exclusively with UPS retailers—not with UPS directly:

All inquiries regarding Packages shipped by any Third-Party Retailer must be directed to the Third-Party Retailer that shipped the Package. UPS will deal solely with the Third-Party Retailer in all matters concerning Packages shipped by any Third-Party Retailer including, but not limited to: tracking/tracing requests; claims and guarantees; C.O.D. preparation and remittance; return of undeliverable Packages; proper packaging and labeling; and billing. Even if UPS responds directly to customers of the Third-Party Retailer regarding tracking requests, UPS will not be liable to those customers. The Third-Party Retailer is solely responsible for the issuance of any refunds and claims to those who shipped Packages by the Third-Party Retailer.

(Compl. ¶ 18.)

Customers who ship packages through one of UPS's retail affiliates do not enter a contractual relationship with UPS. (Compl. ¶ 19.) Rather, the retailer itself acts as the shipper and as the sole party in contractual privity with UPS. (Compl. ¶ 19.) Indeed, UPS frequently defends itself in litigation against claims brought by retail customers by asserting that UPS does not have a contractual relationship with retail customers. *See, e.g.*, *Siefer v. United Parcel Service, Inc.*, No. 212-2012-CV-00210, 2013 WL 8434806, at *3 (N.H. Super. Jan. 23, 2013) ("Siefer did not contract with UPS but rather with the UPS Store by which she shipped the package, and Siefer is not in privity of contract with UPS."); Brief for UPS at 7, *Tarr Technology Consulting LLC v. United Parcel Service, Inc.*, No. 6533012012, 2013 WL 9675800 (N.Y.Sup. Dec. 2, 2013) ("UPS has no liability to customers of a Third-Party Retailer for damages arising from packages shipped from Third-Party Retailers.").

## II.     UPS's Daily and Retail Rates

UPS publishes two rate sheets governing shipping rates in the lower forty-eight United States: (1) "Daily Rates" and (2) "Retail Rates." (Compl. ¶ 20.) UPS's Daily Rates apply to customers who hold UPS accounts and originate shipments using their UPS accounts. (Compl. ¶ 19.) UPS's Retail Rates, by contrast, apply to all shipments processed and paid for at one of UPS's Third Party Retailers. (Compl. ¶ 19.)

## III.    UPS's Inflated Delivery Area Surcharge

As detailed in the Complaint, this case concerns a widespread, fraudulent billing practice perpetuated by UPS. (Compl. ¶ 1.) UPS charges customers a fee called a "Delivery Area Surcharge" to deliver packages to certain remote areas in the lower forty-eight states. According to

UPS's published rates, the fee, depending on the circumstances, ranges from $1.50 to $4 per package. (Compl. ¶ 1.) With respect to institutional customers who hold UPS accounts (typically frequent shippers like large businesses and government agencies), UPS charges the fee in accordance with its advertised rates. (Compl. ¶ 1.) For many years, however, UPS has engaged in a bait and switch with respect to *retail customers*—customers who ship packages through UPS's third-party affiliates, including UPS Store centers. (Compl. ¶ 1.) These customers are charged a Delivery Area Surcharge that is approximately *double* the amount listed in the company's published rates. (Compl. ¶ 1.)

UPS's overcharge is deliberate and widespread. UPS controls the amount charged by its retail affiliates by requiring affiliates to process transactions using UPS's proprietary, centralized software platform: iShip. (Compl. ¶ 34.) Regardless of whether a package is shipped through a UPS account or through a UPS Third Party Retailer, packages are shipped using the iShip software platform. (Compl. ¶ 34.) UPS intentionally programmed the iShip software to overcharge retail customers on the Delivery Area Surcharge. (Compl. ¶ 34.)[1]

## IV. The Alleged "My Choice" Service Agreement

UPS avers that on April 20, 2015, Plaintiff signed up for a service called UPS My Choice. (UPS Memo at 5.) The My Choice service is a service related to receiving package deliveries (*see* ups.com/mychoice); it has nothing to do with the act of shipping a package. Plaintiff has no memory of signing up for this service. (Holl Decl. ¶ 2.) According to UPS's representation of the

---

[1] UPS defends the company's inflated charges in its motion, but UPS fails to demonstrate that it may impose them. UPS's terms and conditions state unequivocally that customers "will be charged" either "Daily Rates" or "Retail Rates." (Compl. Ex. A at 20.) UPS's Retail Rates—applicable to retail customers—state, in turn, that "[s]hippers who do not receive Daily Rates will be charged Retail Rates." (Compl. Ex. C at 2.) UPS's Retail Rates set forth the precise amount of the Delivery Area Surcharge. (Compl. Ex. C at 117.) UPS points to an unconnected piece of text appearing under the heading "Notes" that states that "Charges may vary at retail locations." (Compl. Ex. C at 117.) UPS's Retail Rates do not say *which* charges vary. Moreover, UPS's interpretive gloss makes no sense. UPS, in its motion, claims that the Retail Rate guide "discloses that the Delivery Area Surcharge may vary depending on whether a package is shipped directly through UPS or through a retail location." But UPS publishes two separate rate guides—one for customers "shipp[ing] directly through UPS" and another rate guide specifically for customers using retail locations. (Compl. Ex. C.) Some charges do indeed vary—by their plain, listed terms. (Compl. Ex. C at 24.) But UPS fails to explain why a piece of stray text stating that "[c]harges may vary at retail locations" authorizes UPS to charge *more than* the company explicitly promises to charge *at retail locations*.

My Choice mobile web sign-up page, the user interface referenced two documents: first, the "UPS Technology Agreement"; and second, the "UPS My Choice® Service Terms." (UPS Memo at 5.) The UPS Technology Agreement contains 96 pages of boilerplate, fine-print terms. (Hansen Decl. ¶ 3, Ex. B.) Notably, on page 8, UPS's Technology Agreement provides that "THE EXCLUSIVE JURISDICTION FOR ANY CLAIM, CASE, OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER FOR BREACH OF CONTRACT, TORT OR OTHERWISE) SHALL BE A FEDERAL OR STATE COURT . . . ." (Hansen Decl. ¶ 3, Ex. B at 8.) The document mentions nothing about arbitration except for a section purporting to require arbitration for residents of Middle Eastern countries. (Hansen Decl. ¶ 3, Ex. B at 13-14.)

As for the second document, the "UPS My Choice® Service Terms," UPS disguises the fact that the My Choice Service Terms themselves in force in April 2015 did not contain an arbitration clause. Rather, the My Choice Service Terms simply stated that:

> These Service Terms ("Terms") govern your use of UPS My Choice services (the "Service"). Except as modified by these Terms, the UPS Tariff/Terms and Conditions of Service, the UPS Rate and Service Guide and the description of the Service available at ups.com/mychoice in effect at the time of service (all of which are subject to change without notice) govern the Service, and are expressly incorporated here by this reference.

(ECF 23-8 at 2.) Although the UPS Tariff referenced in this passage contains an arbitration clause beginning on page 26 (ECF 23-5 at 27), UPS's My Choice Service Terms did not contain a hyperlink to the UPS Tariff at the time. (ECF 23-8 at 2.)

Some time after Plaintiff allegedly signed up for the My Choice Service, UPS modified its My Choice Service Terms to make reference to arbitration, and include a hyperlink to the UPS Tariff. (Hansen Decl. ¶ 2, Ex. A.) Unlike the terms in force when Plaintiff allegedly signed up for the My Choice Service, UPS' My Choice Service Terms now provide:

> The UPS Tariff includes an Agreement to Arbitrate Claims, providing for binding arbitration of claims on an individual basis (except as otherwise provided). The Agreement to Arbitrate Claims contained in the UPS Tariff can be viewed by clicking the link to the UPS Tariff above and also is available at http://www.ups.com/content/us/en/resources/ship/terms/claims-legal-action.html.

(Hansen Decl. ¶ 3, Ex. A at 1.) The updated terms appear to be identical to the prior version of the terms in all other respects. (Hansen Decl. ¶ 3, Ex. A at 1.)

## V. Plaintiff's Shipment

On June 18, 2016, Plaintiff presented a package for shipment at the UPS Store located at 1083 Vine Street, in Healdsburg, California. (Compl. ¶ 39.) Plaintiff was charged a Delivery Area Surcharge of $5.92. (Compl. ¶ 40.) Based on UPS's Retail Rates, Plaintiff should have been charged a Delivery Area Surcharge of $3.15. (Compl. ¶ 40.) Plaintiff paid the amount specified in the inflated invoice, relying upon the invoice's implicit representation that the invoiced amount was honestly owed. (Compl. ¶ 41.)

Other than the shipment receipts, Plaintiff was not shown or given any additional documents. (Compl. ¶ 40; Holl Decl. ¶ 3.) Plaintiff simply entered the store, tendered his package, paid the amount requested on the receipt generated by UPS's computer system, and left. (Holl Decl. ¶ 3.) In its brief, UPS states that "[t]he store would have provided Plaintiff with a Parcel Shipping Order for his package." (UPS Memo at 7 (citing ECF 23-3 at 2).) In fact, the UPS Store did not provide Plaintiff with a Parcel Shipping Order, or any similar document. (Holl Decl. ¶ 3.)

## VI. Plaintiff's Claims

In his Complaint, Plaintiff asserts statutory claims against UPS under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") and the Interstate Commerce Act, 49 U.S.C. § 13101, *et seq.* ("ICA"), as well as a claim for unjust enrichment under federal common law, or in the alternative, state common law. Plaintiff does *not* assert a breach of contract claim. (Complaint, Counts I-IV.)

## LEGAL STANDARDS

## I. Standard for Determining Whether an Arbitration Agreement Exists

A court may order arbitration of a particular dispute "only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 297 (2010) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648-49 (1986)). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.* (citing *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 (2010)).

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[2] The Federal Arbitration Act requires courts to "place such agreements [to arbitrate] upon the same footing as other contracts." *Granite Rock*, 561 U.S. at 302.

## II.      Rules of Contract Formation

"[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen*, 763 F.3d at 1175 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)).[3] A transaction, "in order to be a contract, requires a manifestation of agreement between the parties" as to its terms. *Specht*, 306 F.3d at 28 (citations omitted). "An offer—and all of its terms—therefore ordinarily precede acceptance." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 121 (2d Cir. 2012). "[T]here is no contract until there has been a meeting of the minds on all material points." *Banner Entertainment, Inc. v. Superior Court*, 62 Cal.App.4th 348, 358 (1998).

Where there is no actual awareness of the contractual terms, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on [inquiry] notice of the term at issue." *Schnabel*, 697 F.3d at 120, 126–27; *see also F. P. Baugh, Inc. v. Little Lake Lumber Co.*, 297 F.2d 692, 696 (9th Cir. 1961); *Nguyen*, 763 F.3d at 1177. With respect to "standardized adhesion contracts between parties of unequal bargaining strength, exclusionary

---

[2] Courts apply the presumption of arbitrability "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand," and "where the presumption is not rebutted." *Granite Rock*, 561 U.S. at 301. The presumption of arbitrability cannot be used "as a substitute for party agreement." *Id.* at 289. In other words, "the presumption of arbitrability does not bear on the threshold issue of whether the parties entered into a binding agreement to arbitrate at all." *Begonja v. Vornado Realty Trust*, 159 F.Supp.3d 402, 413 (S.D.N.Y. 2016) (citing *Applied Energetics, Inc. v. New Oak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)). "There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate ...." *Freeman v. State Farm Mut. Auto. Ins. Co.*, 14 Cal.3d 473, 481 (1975).

[3] Plaintiff agrees with UPS that the relevant principles of contract formation and construction are the same under California law, New York law, and federal common law. Any choice of law analysis, therefore, does not change the result in this case. *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906, 919 (2001) (choice-of-law factors for cases venued in California); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29 (1979) (test for applying federal common law).

clauses and provisions limiting liability are ineffective in the absence of a plain and clear notification to the public and an understanding consent." *Id.* (citing *Ramirez v. Superior Court*, 103 Cal.App.3d 746 (1st Dist. 1980); *Bauer v. Jackson*, 15 Cal. App. 3d 358 (4th Dist. 1971)). [4] And "[w]here the [drafting party] has reason to believe that the [non-drafting party] manifesting ... assent would not do so if he knew that the writing contained a particular term, *the term is not part of the agreement*." *Fischer v. First Intl. Bank*, 109 Cal.App.4th 1433, 1446 (App. 4th Dist. 2003) (quoting Restatement (Second) of Contracts § 211(3) (emphasis added)). "The general rule, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it, does not apply to an adhesion contract." 14 Cal. Jur.3d Contracts § 71 (2016) (citing *Bruni v. Didion*, 160 Cal.App.4th 1272, 1291 (4th Dist. 2008)).

When examining adhesion contracts, courts look at three factors in determining "whether a *reasonably prudent offeree* would be on [inquiry] notice of the term at issue." *Schnabel*, 697 F.3d at 120, 126–27 (emphasis added); *F. P. Baugh*, 297 F.2d at 696; *Nguyen*, 763 F.3d at 1177. **First**, the term must be *conspicuous*. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware . . . ." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App.3d 987, 992 (1972); *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal.App.4th 1042, 1049 (2001); *Specht*, 306 F.3d at 28. "Thus, any such [term] must be placed and printed so that it will attract the reader's attention." *Haynes v. Farmers Ins. Exchange*, 32 Cal.4th 1198, 1204 (2004); *see also* 2 Williston on Contracts 4th, § 6:47 (offeree must have actual knowledge "where the terms are printed in too fine type, or in cramped type," where "the terms have been superimposed on other matter, where they are printed on the back of the document[,]" or where "the conditions are buried in a mass of fine type."). **Second**, the term must be "plain and clear." *See Haynes*, 32 Cal.4th at 1204; *Steven v.*

---

[4] A contract of adhesion is a "standardized contract that, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." 14 Cal. Jur.3d Contracts § 10 (citing *Perdue v. Crocker National Bank*, 38 Cal. 3d 913 (1985)) The governing test is "whether the parties were free to alter or negotiate the terms of the proffered agreement." *Id.* (citing *Parr v. Superior Court*, 139 Cal. App. 3d 440 (1st Dist. 1983)). "The freedom of the adhering party to choose not to contract at all is irrelevant." *Id.*

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

*Fidelity & Casualty Co.*, 58 Cal.2d 862, 878 (1962); *State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal.3d 193, 201-02, 110 Cal.Rptr. 1 (1973). "This means more than the traditional requirement that contract terms be 'unambiguous.' Precision is not enough. Understandability is also required.'" *Haynes*, 32 Cal.4th at 1211 (quoting *Jauregui v. Mid–Century Ins. Co.*, 1 Cal.App.4th 1544, 1550 (1991)).[5] ***Third***, the term must be affirmatively "brought to the attention of the party and explained." *Haynes*, 32 Cal.4th at 1210 (quoting *Fields v. Blue Shield of California*, 163 Cal.App.3d 570, 578 (1985)); *Smith v. Westland Life Ins. Co.*, 15 Cal.3d 111, 122-23 (1975)); *Wheeler v. St. Joseph Hospital*, 63 Cal.App.3d 345, 359-60 (1976); *Penilla v. Westmont Corporation*, 3 Cal.App.5th 205, 2016 WL 4709888 (2d Dist. 2016). Collectively, these factors are known as the standard of "reasonable communicativeness." *See, e.g.*, *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 835 (9th Cir. 2002); *Specht*, 306 F.3d at 30-32; Juliet M. Moringiello, *Signals, Assent, and Internet Contracting*, 57 Rutgers L. Rev. 1307, 1334–40 (2005).

The standard of reasonable communicativeness is essential to maintaining the integrity of inquiry notice as a valid stand-in for mutual assent. Adhesive contracts are often delivered mechanically, where there is no other person present and available to highlight or explain the terms. *See, e.g.*, *Steven*, 58 Cal.2d at 877; *Fritz v. Old Am. Ins. Co.*, 354 F.Supp. 514, 518 (S.D. Tex. 1973). When dealing with a contract delivered mechanically, "[t]he inanimate machine t[ells] the purchaser nothing, and even if he . . . want[s] to ask about the [terms], the box could not . . . answer[]." *Steven*, 58 Cal.2d at 877. "Thus, to maintain the concept of two informed contracting parties, it is logical to impose a greater duty on [the drafting party] to clearly and completely explain its [terms] in the [materials provided]." *Fritz*, 354 F.Supp. at 518. Further, exclusionary or exculpatory terms contained in contracts of adhesion must be conspicuous, obvious, and clear because the contractual nature of the agreement is often not obvious, *see Windsor Mills, Inc. v. Collins & Aikman Co.*, 25 Cal.App.3d 987, 993 (1972); *Los Angeles Inv. Co. v. Home Savings*

---

[5] Ambiguities in adhesion contracts are interpreted against the drafter of the contract. *See Sandquist v. Lebo Automotive, Inc.*, 1 Cal. 5th 233, 248 (2016); *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 819 n.16 (1981). "Ambiguity exists where the terms of the contract are inconsistent on their face, or are reasonably susceptible to more than one interpretation . . . ." Am. Jur. 2d, Contracts § 263.

*Bank of Los Angeles*, 180 Cal. 601, 614 (1919); *Steven*, 58 Cal.2d at 881, and such terms often serve to defeat the reasonable expectations of the non-drafting party. *See Haynes*, 32 Cal.4th at 1213; *Steven*, 58 Cal.2d at 878; *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 270 (1966) (citing Kessler, *Contracts of Adhesion*, 43 Colum. L. Rev. 629, 637 (1943)).

Courts have applied these principles to a wide range of adhesive agreements, including tickets for travel,[6] parking lot tickets,[7] insurance policies purchased through a vending machine,[8] insurance policies sold through the mail,[9] bank passbooks,[10] delivery sheets,[11] warehouse receipts,[12] and freight bills.[13] And courts have employed these same principles in examining a wide variety of exculpatory and exclusionary provisions, including terms waiving or limiting liability,[14] shortening the time to file suit,[15] excluding coverage,[16] imposing a forum section clause,[17] or requiring arbitration of claims.[18] Judge Henry Friendly, surveying the law in this area, aptly summarized the case law as follows: "[w]hile [courts] would not insist on any particular rubric[,]" "[t]he thread that runs implicitly through the cases" . . . "is that the [drafting party] had

---

[6] *The Majestic*, 166 U.S. 375 (1897); *Silvestri v Italia Societa Per Azioni Di Navigazione*, 388 F.2d 11 (2d Cir. 1968).

[7] *California State Auto. Asso. Inter-Insurance Bureau v Barrett Garages, Inc.*, 257 Cal App 2d 71 (1st Dist. 1967) (liability limitation).

[8] *Steven*, 58 Cal.2d at 878; *Roberts v. Fidelity & Cas. Co. of New York*, 452 F.2d 981 (9th Cir. 1971); *Haynes*, 32 Cal.4th at 1210.

[9] *Raulet v. Northwestern etc. Ins. Co.*, 157 Cal. 213 (1910); *Fritz*, 354 F.Supp. at 518.

[10] *Los Angeles Inv. Co. v. Home Sav. Bank*, 180 Cal. 601, 613 (1919).

[11] *May Hosiery Mills v. G.C.Hall & Son*, 77 Cal. 291, 294 (1926).

[12] *Wilson v. Crown Transfer etc. Co.*, 201 Cal. 701, 714 (1927).

[13] *McQueen v. Tyler*, 61 Cal.App.2d 263, 267 (1943); *India Paint Co. v. United Steel Prod. Corp.*, 123 Cal.App.2d 597, 610 (1954); *Scott's V.F. Exch. v. Growers Refrig. Co.*, 81 Cal.App.2d 437 (1947); *May Hosiery Mills v. G. C. Hall & Son*, 77 Cal.App. 291 (1926).

[14] *The Majestic*, 166 US 375 (1897); *La Bourgogne*, 144 F. 781 (2d Cir. 1906).

[15] *Silvestri*, 388 F.2d at 11; *Los Angeles Inv. Co.*, 180 Cal. at 613.

[16] *Roberts*, 452 F.2d at 981; *Steven*, 58 Cal.2d at 878; *Raulet*, 157 Cal. at 213; *Haynes*, 32 Cal.4th at 1210.

[17] *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995).

[18] *Wheeler*, 63 Cal.App.3d at 359-60; *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987 (2d Dist. 1972); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016).

1  done all it reasonably could to warn the [offeree] that the terms and conditions were important
2  matters of contract affecting his legal rights . . . ." *Silvestri*, 388 F.2d at 16-17 (citations omitted).

3      The same standards apply to transactions occurring over the internet. "While new
4  commerce on the Internet has exposed courts to many new situations, it has not fundamentally
5  changed the principles of contract." *Nguyen*, 763 F.3d at 1175 (quoting *Register.com, Inc. v.*
6  *Verio*, 356 F.3d 393, 403 (2d Cir. 2004)); *see also Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 377-
7  413 (E.D.N.Y. 2015) [19] ("Sometimes forgotten in the Internet Age—where contracts of adhesion
8  are often the rule for online consumers—is the essential element of contract formation: mutual
9  manifestation of assent"); *Meyer v. Kalanick*, --- F.Supp.3d ----, No. 15 Civ. 9796, 2016 WL
10 4073012, at *6 (S.D.N.Y. July 29, 2016). Thus, "[w]hether a user has inquiry notice of a[n]
11 [internet] agreement . . . depends on the design and content of the website and the agreement's
12 webpage." *Nguyen*, 763 F.3d at 1177.[20] Courts must consider whether "there [is] substantial
13 evidence from the website that the user was aware that she was binding herself to more than an
14 offer of services or goods[;]" whether the "design and content of the website, including the
15 homepage, make the 'terms of use' (i.e., the contract details) readily and obviously available to the
16 user[;]" whether "the importance of the details of the contract [are] obscured or minimized[;]" and
17 whether the "merchant clearly dr[ew] the consumer's attention to material terms that would alter
18 what a reasonable consumer would understand to be her default rights when initiating an online
19 consumer transaction[.]" *Berkson*, 97 F.Supp.3d at 402.

20

21 [19] If this Court were to read only one opinion, it should be Judge Jack Weinstein's decision in
22 *Berkson*, 97 F.Supp.3d at 359. Judge Weinstein assiduously traces the heritage of the contract
   doctrines of mutual assent, inquiry notice, and reasonable communicativeness, and carefully
23 examines how those same standards apply to internet contracting.

24 [20] "Confusion arose about a dozen years ago when academics developed a formation typology
   based on an artificial dichotomy between what became known as 'clickwrap' and 'browsewrap';
25 some courts followed that typology." Juliet M. Moringiello and William L. Reynolds, *From Lord*
   *Coke to Internet Privacy: The Past, Present, and Future of the Law of Electronic Contracting*, 72
26 Md. L. Rev. 452, 460 (2013). "In more recent years, however, judges have rejected that false
   dichotomy and returned to the traditional formation test of reasonable communicativeness." *Id.*
27 (citing cases); *see also Berkson*, 97 F.Supp.3d at 402; *Meyer*, 2016 WL 4073012, at *6 (inquiry
   "turns more on customary and established principles of contract law than on newly-minted terms
28 of classification").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

**I.** **Plaintiff Did Not Agree to Arbitrate His Shipping Dispute When He Allegedly Signed Up for UPS's My Choice Service**

UPS's attempt to impose arbitration fails the reasonable communicativeness test by a mile. First, UPS's arbitration provision is wildly *inconspicuous*—it is not found on the web interface or either of the documents identified on the web interface. Instead, it is buried multiple layers deep in a separate document that is referenced (not hyperlinked) in one of the identified documents. UPS's subsequent modifications of the My Choice terms demonstrate that *even UPS understood* that the arbitration term was fatally inconspicuous. Second, UPS's contention that the arbitration provision covers shipping disputes with retail customers is neither *plain nor clear* from the documents. The first document presented to consumers states that "THE EXCLUSIVE JURISDICTION FOR ANY CLAIM . . . RELATING TO THIS AGREEMENT . . . SHALL BE A FEDERAL OR STATE COURT . . . ." (Hansen Decl. ¶ 3, Ex. B at 8.) Further, UPS's My Choice terms tell the reader that the terms, along with the incorporated documents, "govern your use of UPS My Choice services"—not shipping disputes. (ECF 23-8 at 2.) Third, UPS took no steps to bring the arbitration clause to the attention of the consumers it claims to bind. On the contrary, UPS did all it could to obscure the term.

**A.** **UPS's Arbitration Provision Is Fatally Inconspicuous**

UPS's arbitration provision is hopelessly inconspicuous. If UPS wanted to bind users of its My Choice Service to arbitrate future shipping disputes, it would not have been hard to do so right up front. Many websites use the emerging "scrollwrap" standard, where users are required to scroll through and assent to the terms right in the main web interface. *E.g.*, *Berkson*, 97 F.Supp.3d at 398-99. UPS did not do so. Instead, UPS endeavored to bury an arbitration clause deep in a tangled web of confusing and conflicting terms.

The first document referenced in the UPS interface—The UPS Technology Agreement—weighs in at 96 pages of fine print. (Hansen Decl. ¶ 3, Ex. B.) The long document contains no mention of an arbitration clause potentially applicable to a United States resident. (Hansen Decl. ¶ 3, Ex. B.) To the contrary, as noted *infra* at 17, the document assures the reader that "the

exclusive jurisdiction" for claims against UPS shall be "a federal or state court." (Hansen Decl. ¶ 3, Ex. B at 8.) The document then purports to incorporate by reference yet more voluminous terms, including a Department of Treasury document totaling 2,112 pages,[21] a second Treasury document containing 30 links containing further terms,[22] a Department of Commerce memo,[23] UPS's 8-page Privacy Notice,[24] UPS's Brand Exchange website containing eight links each providing further information,[25] and the U.S. Export Administration Regulations and "all applicable U.S. laws"[26]—none of which discusses arbitration.

After reviewing UPS's Technology Agreement and thousands of pages of incorporated terms, a consumer might attempt to review the second document referenced on UPS's user interface: UPS's My Choice terms. But these terms, just like the Technology Agreement, do not contain an arbitration clause. (ECF 23-8 at 2.) Rather, the My Choice Service Terms stated:

> These Service Terms ("Terms") govern your use of UPS My Choice services (the "Service"). Except as modified by these Terms, the UPS Tariff/Terms and Conditions of Service, the UPS Rate and Service Guide and the description of the Service available at ups.com/mychoice in effect at the time of service (all of which are subject to change without notice) govern the Service, and are expressly incorporated here by this reference.

(ECF 23-8 at 2.) Neither the "description of the Service available at ups.com/mychoice" nor the UPS Rate and Service Guide (which contains 367 pages) mention arbitration. (Compl. Ex. C.) Although the UPS Tariff does contain an arbitration provision beginning on page 27 (Compl. Ex. A at 27), UPS's My Choice terms do not contain a hyperlink directing to the reader to the UPS Tariff. (ECF 23-8 at 2.) In short, UPS's arbitration provision is buried as deeply as possible under a mountain of documents and terms.

---

[21] (Hansen Decl. ¶ 3, Ex. B at 3 (citing http://www.treasury.gov/ofac/downloads/sdnlist.txt).)

[22] (Hansen Decl. ¶ 3, Ex. B at 3 (citing http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx).)

[23] (Hansen Decl. ¶ 3, Ex. B at 3 (citing http://www.bis.doc.gov/complianceandenforcement/liststocheck.htm).)

[24] (Hansen Decl. ¶ 3, Ex. B at 9 (citing https://www.ups.com/content/us/en/resources/ship/terms/privacy.html).)

[25] (Hansen Decl. ¶ 3, Ex. B at 67 (citing https://www.upsbrandexchange.com/brLanding.awsp).)

[26] (Hansen Decl. ¶ 3, Ex. B at at 3.)

Even outside of the context of adhesion contracts (where the requirements to show assent are far more strict compared to mutually-negotiated contracts), UPS's two-tiered incorporation by reference would be insufficient to create a binding agreement to arbitrate. As UPS acknowledges, "[f]or the terms of another document to be incorporated into the document, the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal.App.3d 632, 641 (1986) (citations omitted).

In *Chan*, the defendant, a securities brokerage firm, employed the plaintiff, a stockbroker. The plaintiff signed a uniform application to register with the major stock exchanges. *Id.* at 636. The application stated that the plaintiff "'agree[d] to abide by the Statute(s), Constitution(s), Rule(s) and By–Laws ... of the agency jurisdiction or organization with or to which [she submitted the application].'" *Id.* The referenced rules required registered stockbrokers to arbitrate any controversy arising out of their employment with a NYSE member. *Id.* The court refused to compel arbitration, explaining "the right to select a judicial forum, vis-à-vis arbitration, is a substantial right, not lightly to be deemed waived." *Id.* at 643 (internal quotations omitted). The court concluded that the reference to "the Statute(s), Constitution(s), Rule(s) and By–Laws" did not incorporate the rule requiring arbitration into the application because the reference "failed to clearly and unequivocally refer to the incorporated document [that included the arbitration provision]" and nowhere mentioned arbitration. *Id.* The same result holds here. UPS's vague reference to the UPS Terms failed to mention arbitration and failed to call attention to the arbitration provision.

Further, UPS's own conduct demonstrates that *even UPS understood* that its arbitration clause was far too inconspicuous to satisfy the requirements of reasonable communicativeness. After Plaintiff allegedly signed up for the My Choice Service, UPS modified its My Choice Service Terms to expressly make reference to arbitration. (Hansen Decl. ¶ 2, Ex. A.) UPS' My Choice Service Terms now provide:

> The UPS Tariff includes an Agreement to Arbitrate Claims, providing for binding arbitration of claims on an individual basis (except as otherwise provided). The Agreement to Arbitrate Claims contained in the UPS Tariff can be viewed by clicking the link to the UPS Tariff above and also is available at http://www.ups.com/content/us/en/resources/ship/terms/claims-legal-action.html.

(Hansen Decl. ¶ 2, Ex. A at 1.) The updated terms appear to be identical to the prior version of the terms in all other respects. (Hansen Decl. ¶ 2, Ex. A.) UPS made this change for one reason: the existing arbitration clause was insufficiently communicated to put a reasonable consumer on notice.[27]

Several cases dealing with exculpatory or exclusionary demonstrate the principle—that such clauses must be conspicuous—in action. For example, in *Haynes*, 32 Cal.4th at 1198, the California Supreme Court refused to enforce an insurance policy's exclusionary clause contained in a single 39-page document because the "language, which appears on the policy's 10th page (numbered '7') as the second of four paragraphs under the heading 'Other Insurance,' [wa]s not conspicuous, plain and clear." *Id.* at 1202, 1205. Evaluating the term's "actual placement in the actual physical policy that was presented to ... insureds[,]" the court relied on "the significance of the fact that 'it appears only after [many] long and complicated page[s] of fine print ....' " *Id.* at 1210 (quoting *Gray*, 65 Cal.2d at 273). In *India Paint Co. v. United Steel Prod. Corp.*, 123 Cal.App.2d 597, 610 (1954), the court held that a disclaimer of liability in an invoice for defective paint did not bind the buyer because of the 'finely-printed statements as to disclaimer' and the fact that 'the provisions are so located as to easily escape attention.' *Id.*; *see also Scott's*, 81 Cal.App.2d at 437; *May Hosiery Mills*, 77 Cal.App. at 291. Similarly, in *Ponder v. Blue Cross of Southern California*, 145 Cal.App.3d 709, 719 (1983), the court held that no meeting of the minds occurred with respect to an exclusionary clause in an insurance contract that was not "positioned in a place and printed in a form which would attract a reader's attention." *See also Windsor Mills*, 25 Cal.App.3d 987 (holding that an arbitration provision contained in fine print, on front and reverse side of standard form, did not constitute written agreement to arbitrate).

---

[27] For purposes of this motion, Plaintiff takes no position on whether UPS's updated terms are sufficiently conspicuous to satisfy the first prong of the reasonable communicativeness test. The updated terms are highlighted simply to demonstrate that UPS understood that the terms in force in April 2015 were not good enough.

Courts considering early shipping contracts reached the same result. For example, in *Silvestri*, 388 F2d 11, the front of a steamship passenger ticket began with the words "Passenger Contract" in boldface type; another provision on the front of the ticket stated "Subject to the conditions" printed on the cover of the ticket and sheets one and two. *Id.* at 14. Subsequent pages contained 35 numbered paragraphs under the label "Terms and Conditions." *Id.* Judge Friendly, noting the "inconspicuousness of these statements," *id.*, refused to enforce a contractual period of limitations because the "draftsman of the ticket [should have] produce[d] a warning significantly more eye-catching than this." *Id.* at 17-18. *See also Smith v North German Lloyd S.S. Co.*, 151 F 222 (2d Cir. 1907) (holding ineffective a liability limitation where the limitation appeared on the back of the ticket); *Azrak v Panama Canal Co.*, 117 F. Supp. 334, 336 (S.D.N.Y. 1953) (denying enforcement of exculpatory term where the face of the passenger's ticket stated, "Subject to the Terms of Passage Contract on the reverse portion of this ticket," and the terms of passage were printed on the reverse in very small type); *O'Connell v Norwegian Caribbean Lines, Inc.*, 639 F Supp 846, 848 (N.D. Ill. 1986) (refusing to enforce a limitation on filing suit where the statement incorporating notice and limitations was insufficiently conspicuous on face of actual ticket).

Cases considering internet contracting have faithfully applied the same conspicuousness requirement. *Berkson*, 97 F.Supp.3d at 404 ("The design and content of the website, including the homepage, did not make the 'terms of use' readily and obviously available to [the consumer]."); *Nguyen*, 763 F.3d at 1177 (finding that the "design and content of the website and the agreement's webpage" insufficient to provide inquiry notice); *Meyer*, 2016 WL 4073012, at \*9 ("[T]he placement of the arbitration clause in [the] User Agreement constituted, as a practical matter, a further barrier to reasonable notice."). Compared to the terms at issue in these cases, UPS's arbitration clause is far less obvious or conspicuous.

**B.    UPS's Arbitration Provision Is Neither Plain nor Clear**

In addition to its inconspicuous nature, UPS's arbitration provision suffers from another glaring flaw: it is neither plain nor clear that signing up for UPS's My Ship service commits a consumer to arbitrate future shipping disputes.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

The first hyperlinked document in UPS's user interface states that "THE EXCLUSIVE JURISDICTION FOR ANY CLAIM, CASE, OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER FOR BREACH OF CONTRACT, TORT OR OTHERWISE) SHALL BE A FEDERAL OR STATE COURT . . . ." (Hansen Decl. ¶ 3, Ex. B at 8.) That should end the matter. No reasonable consumer would *keep reading* to see if UPS would go on to contradict itself hundreds of pages later (thousands later if the consumer dutifully reads all of the incorporated materials). And if a consumer *did* continue to read the Technology Agreement, she would eventually encounter a provision claiming to require arbitration for residents of Middle Eastern countries. (Hansen Decl. ¶ 3, Ex. B at 13-14.) A consumer who made it this far might conclude, reasonably, that if UPS wished to impose arbitration on U.S. residents, it would have done so here.

Even ignoring the Technology Agreement, UPS's My Choice terms (the second document referenced on the user interface) fail to plainly and clearly indicate that arbitration is required in connection with future shipping disputes. Indeed, the My Choice terms fail to mention arbitration at all. (ECF 23-8 at 2.) The My Choice Terms merely state that "the UPS Tariff/Terms and Conditions of Service, the UPS Rate and Service Guide and the description of the Service available at ups.com/mychoice in effect at the time of service (all of which are subject to change without notice) govern the Service, and are expressly incorporated here by this reference." (ECF 23-8 at 2.) By using the phrase "govern the Service," UPS signals that the incorporated documents apply to a *consumer's use of the My Choice Service itself*, not generally.[28] Even UPS does not contend that Plaintiff was using the My Choice service (which relates to *receipt* of packages) when he physically dropped off his package for shipment at the UPS Store.

UPS's user interface itself similarly fails to alert the reasonable user that the hyperlinked document contains binding contractual terms. "The reasonable user might be forgiven for

---

[28] "If a reference [to extrinsic documents] . . . indicates an intention to incorporate them generally, they become a part of the contract for all purposes." 14 Cal. Jur. 3d Contracts § 238 (citations omitted). "On the other hand, when reference is made to another writing for a particular specified purpose, that other writing becomes a part of the contract for that purpose only . . . ." *Id.* (citing *Nielsen v. Swanberg*, 99 Cal. App. 270 (1st Dist. 1929); *Moreing v. Weber*, 3 Cal. App. 14 (3d Dist. 1906)).

assuming that 'Terms of Service' refers to a description of the types of services that [the company] intends to provide, not to the user's waiver of his constitutional right to a jury trial or his right to pursue legal redress in court should [the company] violate the law." *Meyer*, 2016 WL 4073012, at *9; *see also Steven*, 58 Cal.2d at 881 (exculpatory terms unenforceable where the contractual nature of the terms is not obvious).

If UPS wished to bind My Choice users to arbitration in future shipping disputes, it could have said as much. Instead, UPS offered a tangled web of conflicting and inapplicable terms. A reasonable consumer would not believe that UPS's Technology and My Choice terms required arbitration of future shipping disputes. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014) (denying enforcement of an arbitration provision where "[a] reasonable person in [the buyer's] position could not be expected to understand that purchasing a vehicle from Toyota would simultaneously bind him or her to [an arbitration provision] with Sirius XM").

Here, too, the case law reinforces the extent to which UPS's various documents fail to clearly and plainly communicate a requirement to arbitrate. *Haynes*, 32 Cal.4th at 1211-12 (refusing to enforce term that "contain[ed] confusing language … along with confusing cross-references to other insurance policies" and was "not 'written in non-technical easy-to-read style.'"); *Gray*, 65 Cal.2d at 273 (refusing to enforce an insurance provision excluding coverage where the provision excluding coverage appeared "only after a long and complicated page of fine print" and the term's "relation to the remaining clauses of the policy and its effect [wa]s … not 'plain and clear'"); *Raulet*, 157 Cal. at 219 (upholding coverage under fire insurance policies despite exclusionary clause, noting that policies were "highly technical in their phraselogy," "complicated and voluminous" and "in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary.")

**C.    UPS Did Nothing To Bring the Arbitration Provision to the Attention of Consumers**

Finally, UPS did nothing to bring its arbitration provision to the attention of consumers. On the contrary, UPS did all it could to minimize and disguise the provision from consumers. *See La Bourgogne*, 144 F 781 (2d Cir. 1906) (refusing to hold a passenger bound by a limitation upon

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

the carrier's liability for lost baggage which was written on the back of his ticket, because the company failed to call the attention of the passenger to the condition on the back); *Sgouros*, 817 F.3d at 1034 (refusing to enforce arbitration provision where the non-adhering party failed to call the consumer's attention to any arbitration agreement); *Steven*, 58 Cal.2d at 877 (finding no mutual assent to exclusionary clause in an insurance policy sold via vending machine where "[n]othing in the instant contract or transaction apprised the insured that the protection of the policy would" be subject to the limitation); *Haynes*, 32 Cal.4th at 1210 (declining to enforce exclusionary clause where the clause was not "brought to the attention of the party and explained"); *Wheeler*, 63 Cal.App.3d at 361 (refusing to enforce a signed arbitration clause where the defendant's agents "never called plaintiffs' attention to the arbitration clause").

* * *

Under these circumstances, compelling arbitration would defeat the reasonable expectations of any consumer. *See Haynes*, 32 Cal.4th at 1213; *Steven*, 58 Cal.2d at 878; *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 270 (1966) (citing Kessler, *Contracts of Adhesion*, 43 Colum. L. Rev. 629, 637 (1943)).[29] "[A]rbitration … clauses materially alter the substantive default rights of a consumer. They are not enforceable against ordinary consumers who are unlikely to be aware of them." *Berkson*, 97 F.Supp.3d at 404. "The purveyors of electronic form contracts are legally required to take steps to provide consumers with 'reasonable notice' of contractual terms." *Meyer*, 2016 WL 4073012, at *10 (citing *Specht*, 306 F.3d at 20). UPS, in relying on a byzantine collection of lengthy, confusing, and contradictory documents has failed to adhere to Judge Friendly's simple maxim: "do[ing] all it reasonably could to warn the [offeree] that the terms and conditions were important matters of contract affecting his legal rights . . . ." *Silvestri*, 388 F.2d at 16-17 (citations omitted). Enforcing such terms would severely undermine "the 'integrity and

---

[29] As one commentator aptly summarized, failing to enforce the traditional rules of contract formation in the internet age effectively replaces the "reasonable consumer" with a person "that is uniquely diligent, overly cautious, highly knowledgeable about wrap contract doctrine, exceptional at multitasking, infinitely patient, and likely does not exist in the real world." *Berkson*, 97 F.Supp.3d at 386 (quoting Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* 111 (2013)).

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

credibility' of 'electronic bargaining[,]'" *id.*, and pose a "genuine risk that a fundamental principle of contract formation will be left in the dust: the requirement for 'a manifestation of mutual assent.'" *Id.* (quoting *Schnabel*, 697 F.3d at 119).

### D. UPS Provides an Insufficient Evidentiary Basis To Compel Arbitration Based on Plaintiff's Alleged Enrollment in UPS's My Choice Service

In addition to lacking legal merit, UPS's motion suffers from fatal evidentiary defects. Although UPS contends that Plaintiff agreed to the My Choice Service Terms (UPS Memo at 5), UPS offers no competent evidence to establish this fact. In this regard, UPS relies entirely on a declaration from employee Christine Calderon. However, Ms. Calderon has no personal knowledge of the relevant facts. *See* Fed. R. Evid. 602 (testimony limited to matters within witness's personal knowledge). Instead, Ms. Calderon relies on the hearsay assertions of another UPS employee, who goes unnamed and is described by Ms. Calderon as a "member of UPS's Customer Technology Marketing group." (Calderon Decl. ¶ 3.) The unsworn statements of an anonymous UPS employee are inadmissible to prove the truth of the underlying assertions. Fed. R. Evid. 801-802. Further, Ms. Calderon indicates that business records are available to establish Plaintiff's membership in the My Choice program, but no such records are provided. (*See* Calderon Decl. ¶ 3.) Finally, UPS offers *no evidence* that Plaintiff *actually agreed* to the UPS My Choice Service Terms. Instead, Ms. Calderon summarily asserts that it "is not possible to enroll in UPS My Choice … without agreeing to the UPS My Choice Service Terms." (Calderon Decl. ¶ 5.) And while Ms. Calderon explains the process for enrolling in the program, including a description of a check box that an enrollee would purportedly click to manifest assent to the terms, UPS has produced *no actual evidence* that Plaintiff himself performed any of these actions. (Calderon Decl. ¶¶ 5-6.) In sum, the central factual premise of UPS's motion is supported by nothing more than supposition and inadmissible hearsay.

## II. Plaintiff Did Not Agree to Arbitrate His Shipping Dispute When He Tendered His Package, and Equitable Estoppel is Inapplicable

As the discussion of the governing legal principles should make plain, Plaintiff did not agree to arbitrate his claims when he presented his package for shipment. Plaintiff signed nothing;

1    he simply entered the UPS Store, tendered his package, paid the amount demanded, and left. (Holl

2    Decl. ¶ 3.)

3          UPS asserts that Plaintiff "received notice of … the UPS Terms" on June 18, 2016, when

4    he shipped his package. (UPS Memo at 7.) But UPS has *no idea* whether this statement is true.

5    The only support UPS provides is a declaration from its attorney in this lawsuit, who states that

6    she "understand[s]" that Plaintiff "would have received" a form notifying him of the UPS Terms

7    at the time he shipped his package. (Sprenkel Decl. ¶ 3.) Counsel provides no explanation of how

8    she came to this understanding. (UPS Memo at 5.) Conspicuously absent from her declaration is

9    any indication that counsel has any personal knowledge of the events of June 18, 2016, or even

10   that she has spoken to any witnesses with such knowledge. *See Clark v. Cty. of Tulare,* 755 F.

11   Supp. 2d 1075, 1084 (E.D. Cal. 2010) ("[A]n attorney's declaration must be made upon personal

12   knowledge. To hold otherwise would ignore the evidentiary rules of hearsay."). Counsel merely

13   assumes—and then UPS represents to the Court as fact—that Plaintiff "received notice" of the

14   terms. (UPS Memo at 7.) This unfounded assumption, misrepresented as fact, cannot form the

15   basis of an order compelling arbitration.

16         UPS conspicuously avoids making any affirmative argument that Plaintiff's shipping

17   transaction bound him to arbitration. Instead, UPS argues that the doctrine of equitable estoppel

18   binds Plaintiff to the arbitration agreement UPS claims it has with its retailers. (UPS Memo at 7.)

19   But equitable estoppel applies only to claims made by closely-related entities that are based on

20   breaches of the same underlying contract containing the arbitration clause. *See Goldman v. KPMG*

21   *LLP*, 173 Cal.App.4th 209, 221 (2009) ("[T]he essence of the doctrine requires that the plaintiff's

22   claims … rely on, or be founded on and inextricably bound up with, the terms or duties of the

23   agreement containing the arbitration clause."). Here, Plaintiff cannot be lumped together with a

24   UPS franchisee as a related entity, and none of Plaintiff's claims are based on allegations that UPS

25   breached any contractual obligation it had to its retailers. Rather, Plaintiff has asserted violations

26   of two federal statutes—RICO and the ICA—along with unjust enrichment claims under federal

27   and state common law. Because these claims are neither founded on nor intertwined with UPS's

28   contractual obligations to its retailers, equitable estoppel is inapplicable.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

Traditionally, under the equitable estoppel doctrine, "a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations." *JSM Tuscany, LLC v. Super. Ct.*, 193 Cal.App.4th 1222, 1237 (2011) (citations omitted). "The rule applies to prevent parties from trifling with their contractual obligations." *Id.* This traditional application of the rule is plainly inapplicable here, where Plaintiff is not a "signatory" to the contract in question.

In *JSM Tuscany*, California's Second District Court of Appeal held that a *nonsignatory* plaintiff may also be compelled to arbitrate. *Id.* at 1239-40. But the court was careful to limit this expansion of the traditional rule to cases where the "plaintiff is suing on a contract — on the basis that, even though the plaintiff was not a party to the contract, the plaintiff is nonetheless entitled to recover for its breach." *Id.* Under these narrow circumstances, "the plaintiff should be equitably estopped from repudiating the contract's arbitration clause." *Id.* However, this version of the rule applies only "when a nonsignatory of a contract is *attempting to seek relief for breach of the contract itself.*" *Id.* at 1240 n.20 (emphasis added). The court specifically noted that the rule does not apply where the nonsignatory plaintiff seeks relief based on "a statute or some other basis outside the contract," including a claim that "arises in equity." *Id.* (quoting *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 158 Cal.App.4th 1061, 1064, 1071 (2008)).

Contrary to UPS's contention, Plaintiff's claims here do not "seek to enforce UPS's purported obligations under its shipping contract with the store." (UPS Memo at 13.) Plaintiff asserts no claim for breach of contract, and the claims he does assert fall squarely within the category of claims excluded from the equitable estoppel rule under *JSM Tuscany*. Plaintiff's claims under RICO and the ICA are clearly based on "a statute," not the contract between UPS and its retailers. The gravamen of the RICO claim is that UPS uses "its network of independently owned and operated affiliates to overcharge and defraud retail customers." (Compl. ¶ 53.) The alleged racketeering activity includes wire fraud and mail fraud. (Compl. ¶ 60.) The ICA claim asserts that UPS has violated a statute prohibiting the dissemination of "false or misleading information" regarding the rates charged by motor carriers. (Compl. ¶ 85.) Neither claim relies on

the contract between UPS and its retailers, much less on an allegation that UPS breached an obligation under that contract. Likewise, Plaintiff's unjust enrichment claims under state and federal law are clearly claims that arise "in equity" and not by virtue of the contract between UPS and its retailers. *See McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003) ("Unjust enrichment is an equitable rather than a legal claim"). Far from seeking to impose obligations under the contract, Plaintiff's claims derive instead from duties imposed under federal statutes and common law principles holding that a common carrier is liable when the carrier charges more than its published rate. (Complaint ¶ 74 (citing 2 Robert Hutchinson *et al.*, *A Treatise on the Law of Carriers, as Administered in the Courts of the United States and England* § 804 (3d ed. 1906)).

While it is true that the UPS Tariff, which contains the arbitration provision, also contains a general description of the Delivery Area Surcharge, the actual published rates are not contained in the UPS Tariff but are published in a separate rate guide. (ECF 23-5 at 15 & ECF 1-2.) But even if the published rates were part of the UPS Tariff, and the failure to adhere to those rates could be construed as a breach of the agreement between UPS and its retail stores, those factors would not change the outcome because Plaintiff is not seeking to enforce the UPS Tariff. In this regard, courts are careful to draw a line between claims founded in and intertwined with the agreement versus claims that simply arise because of some precursor act involving the agreement. The California Court of Appeal explained this distinction in *DMS Services Inc. v. Superior Court*, 205 Cal.App.4th 1346, 1355 (2012):

> ZSC also contends DMS's claims are "inextricably intertwined" with the deductible agreements because those agreements give rise to DMS's claims . . . . This argument confuses the concept of "claims founded in and intertwined with the agreement containing the arbitration clause" with but-for causation. A standard indemnity claim, for example, does not exist *but for* the precursor action giving rise to it. Nevertheless, in those circumstances, the doctrine of equitable estoppel does not bind nonsignatory indemnitors to an arbitration agreement between the parties to the underlying action when, as here, the indemnity claims are not founded in the contract containing the arbitration provision . . . .

Plaintiff's claims here, which are founded in federal statutes and common law equitable doctrines, are analogous to the indemnity claim described in *DMS Services*. They bear a relationship to

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

UPS's failure to honor its published rates, but that connection does not transform Plaintiff's claims into claims founded in the contract.

Moreover, the lack of any agency or close relationship between Plaintiff and UPS's retailers is also fatal to UPS's argument. "The common thread of [cases applying equitable estoppel to a nonsignatory plaintiff] is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement. In the absence of such a relationship, courts have refused to hold nonsignatories to arbitration agreements." *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 75 (2000). The most common scenario where courts apply the doctrine involves medical malpractice claims brought by "relatives of patients who have agreed to arbitration." *Id.* at 74. But courts have appropriately refused to expand the doctrine to parties who lack such a mutual identity. *Id.* at 75 (citing cases). Indeed, the consequences of expanding the doctrine as proposed by UPS would produce far-reaching and counterintuitive results. Under UPS's reasoning, for example, a consumer who walks into a McDonald's franchise would be forced to arbitrate any claim related to the restaurant's franchise agreement (for example, claims related to food quality standards)—even if the customer herself never agreed to arbitration. Inverting the equitable estoppel doctrine would force countless unwary consumers into arbitration on the theory that they are bound to myriad agreements between franchisors and franchisees, parent companies and subsidiaries, and other business affiliates. The Court should decline to UPS's invitation to extend the doctrine so far.

## CONLCUSION

For the foregoing reasons, UPS's motion should be denied.[30]

---

[30] Where a dispute is subject to arbitration under the terms of a written agreement the district court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. The Ninth Circuit, however, has held that courts have discretion under 9 U.S.C. § 3 to dismiss claims that are subject to an arbitration agreement. *See Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988); *accord Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004) (holding that the district court properly exercised its discretion in dismissing an action where all claims were subject to arbitration). If this Court grants UPS's motion, dismissal is the appropriate remedy.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

Date:  January 18, 2017

**APOLLO LAW, LLC**

By: /s/ Adam W. Hansen

Attorneys for Plaintiff RANDALL HOLL