UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDALL HOLL,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>        Defendant. | Case No. 16-cv-05856-HSG<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Re: Dkt. No. 23 |

Pending before the court is Defendant United Parcel Service, Inc.'s ("UPS") motion to compel arbitration and stay proceedings pending the results of arbitration. Dkt. No. 23. For the reasons described below, the Court **GRANTS** the motion and **STAYS** the case.[1]

## I. BACKGROUND

### A. Procedural History

Plaintiff Randall Holl ("Plaintiff") filed this action on behalf of himself and a putative nationwide class of purchasers "who shipped one or more parcels through UPS's retail affiliates and were charged a Delivery Area Surcharge exceeding the amount listed in UPS's Retail Rates" during the four years preceding the filing of the Complaint. Dkt. No. 1 ("Compl.") ¶ 43. Plaintiff asserts four claims for relief against Defendant: (1) conducting affairs of an enterprise in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), *id.* ¶¶ 53-72; (2) violating a federal transportation statute, 49 U.S.C. § 13708(b), Compl. ¶¶ 85-90; (3) unjust enrichment under federal law, Compl. ¶¶ 91-93; and (4) unjust enrichment under state law, *id.* ¶¶ 94-96.

On December 19, 2016, Defendant filed its motion to compel arbitration and stay

---

[1] The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b).

1  proceedings. Dkt. No. 23. On January 18, 2017, Plaintiff filed his opposition to the motion to

2  compel. Dkt. No. 29. On February 1, 2017, Defendant filed its reply. Dkt. No. 32.

### B. Factual Allegations[2]

The record is undisputed as to the relevant facts. Plaintiff enrolled in Defendant's My Choice Program ("My Choice") online on April 20, 2015.[3] Dkt. No. 23-7 ¶ 3 (Decl. of Christine Calderon) ("Calderon Decl."). General membership in My Choice is completely optional and free of charge. *Id.* ¶ 4. To complete registration in the program, the applicant must check a checkbox which appears next to text that reads, "By selecting this checkbox and the Continue button, I agree to the UPS Technology Agreement and the UPS My Choice® Service Terms." *Id.* ¶ 5 (attached screenshot). The UPS My Choice Service Terms are hyperlinked next to the checkbox, *id.*, and a user can access the full text by clicking the hyperlink, *id.* ¶ 6.

The UPS My Choice Service Terms were in effect when Plaintiff enrolled in the program. *Id.* ¶ 7. The first paragraph contains the following provision:

> **Governing Terms**. These Service Terms ("Terms") govern your use of UPS My Choice services (the "Service"). Except as modified by these Terms, the UPS Tariff/Terms and Conditions of Service, the UPS Rate and Service Guide and the description of the Service available at ups.com/mychoice in effect at the time of service (all of which are subject to change without notice) govern the Service, and are expressly incorporated here by this reference. The most current and controlling versions of the UPS Tariff/Terms and Conditions of Service and the UPS Rate and Service Guide are published at ups.com. You expressly acknowledge having reviewed, understood and agreed to the UPS Tariff/Terms and Conditions of Service and

---

[2] On a motion to compel arbitration, the Court "may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party." *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)); *see also Atlas Int'l Mktg., LLC v. Car-E Diagnostics,. Inc.*, No. 5:13-CV-02664-EJD, 2014 WL 3371842, at *3 (N.D. Cal. July 9, 2014) (quoting *Macias* for the same proposition); *King v. Hausfield*, No. C-13-0237 EMC, 2013 WL 1435288, at *1 (N.D. Cal. Apr. 9, 2013) (citing *Macias* and *Ostroff*).

[3] While Plaintiff nominally disputes in his opposition that he enrolled in My Choice, Dkt. No. 29 at 26, he states in an accompanying declaration that he reviewed his emails and "saw an email from UPS indicating that [he] did in fact sign up for" My Choice on April 20, 2015, Dkt. No. 29-4 ¶ 3 (Decl. of Randall Holl) ("Holl Decl."). Plaintiff's access to a service or website that requires an indication of assent to terms before being granted access is sufficient evidence that he signed up for the service. *See Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *7 (N.D. Cal. June 25, 2014) (finding that plaintiffs "[could not] credibly claim ignorance as to whether they actually clicked the appropriate checkboxes" accepting the terms of service because they admitted having access to the service).

the UPS Rate and Service Guide and accept their application. . . .

By using the Service, you agree to these Terms.

*Id.* ¶ 8; *see also* Dkt. No. 23-8 at 2 (UPS My Choice Service Terms).

The UPS Tariff/Terms and Conditions of Service, in turn, "contain the general terms and conditions of contract" under which UPS and its affiliates transport shipments. Dkt. No. 23-4 ¶ 2 (Decl. of Kenneth Liberatore) ("Liberatore Decl."). They are available at ups.com—more specifically, at http://www.ups.com/media/en/terms_service_us.pdf. *Id.* ¶ 3. At the time of Plaintiff's enrollment, to access the UPS Tariff/Terms and Conditions of Service from ups.com, users had to click a hyperlink at the bottom of the page that reads "Service Terms and Conditions." *Id.* That led to a "Service Terms and Conditions" screen, which included a list of eight hyperlinked sets of terms and conditions, the first of which was the UPS Tariff/Terms and Conditions of Service. *Id.* ¶ 7 (attached screenshot). That link led to the text of the UPS Tariff/Terms and Conditions of Service, section 52 of which is titled "Claims and Legal Actions: Individual Binding Arbitration of Claims." *Id.* ¶ 4. The relevant text of this section states:

> **Claimant and UPS agree that, except for disputes that qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits on their jurisdictions over civil disputes), any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration.**

*Id.* (bold in original). Plaintiff alleges he "[has] no memory of reading any of UPS's terms in the course of signing up for" My Choice. Holl Decl. ¶ 3. Sometime after Plaintiff's enrollment, Defendant amended the UPS My Choice Service Terms to include a hyperlink to the exact URL of the UPS Tariff/Terms and Conditions of Service and to expressly refer to the arbitration clause therein. Dkt. No. 29-1 ¶ 2 (Decl. of Adam W. Hansen) ("Hansen Decl."); Dkt. No. 29-2 at 2 (amended UPS My Choice Service Terms).

On June 18, 2016, Plaintiff shipped a package from the UPS Store in Healdsburg, California. Compl. ¶ 39. The store charged a Delivery Area Surcharge of $5.92 on this transaction; Plaintiff contends that charge should have been $3.15. *Id.* ¶ 40. This alleged

3

overcharge is the basis for his lawsuit.

## II. LEGAL STANDARD

Under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), federal district courts are required to stay judicial proceedings and compel arbitration of claims covered by an enforceable arbitration agreement. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014). If the party seeking arbitration establishes that (1) the parties agreed to arbitrate, and (2) the scope of that agreement encompasses the claims at issue, a court must compel arbitration. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2008) (per curiam). "The standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory terms." *Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991). Moreover, "any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) (internal quotation marks omitted).

Given the contractual nature of arbitration, however, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks omitted). To determine whether the parties have established a valid and enforceable agreement to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). A preliminary inquiry is choice of law. Where, as here, "there is no contractual choice-of-law provision, and California is the forum state," California law generally applies "unless a party litigant timely invokes the law of a foreign state." *See ABF Capital Corp. v. Grove Props. Co.*, 126 Cal. App. 4th 204, 215 (2005) (quoting *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 919-20 (2001)). Because neither party has invoked the law of a foreign state, the Court applies California law.

Defendant, "as the party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996)). The party opposing the motion on the ground that there is no binding

agreement to arbitrate should receive "the benefit of all reasonable doubts and inferences that may arise." *Garbacz v. A.T. Kearny, Inc.*, No. C 05-05404 JSW, 2006 WL 870690, at *2 (N.D. Cal. Apr. 4, 2006) (quoting *McCarthy v. Providential Corp.*, No. C 94-0627 FMS, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)). As to the question of the agreement's scope, the burden is on Plaintiff "to show the agreement cannot be interpreted to apply to the dispute . . . ." *Gravillis v. Coldwell Banker Residential Brokerage Co.*, 143 Cal. App. 4th 761, 772 (2006).

## III. DISCUSSION

Here, the key threshold question is whether an agreement to arbitrate exists. The Court analyzes the applicability of the arbitration clause within the UPS Tariff/Terms and Conditions of Service under California principles of contract formation.

### A. A valid agreement to arbitrate exists

"To form a contract, a manifestation of mutual assent is necessary." *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999). Plaintiff argues that the arbitration provision is not binding because Defendant's reference to the UPS Tariff/Terms and Conditions of Service was "wildly inconspicuous," rendering it impossible for him to meaningfully consent to the terms. Dkt. No. 29 at 18.

This reasoning has failed in this Circuit before, and it does so again here. Courts have sorted online agreements into two primary groups: clickwrap and browsewrap. In a clickwrap agreement, "users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use . . . ." *Nguyen*, 763 F.3d at 1175-76. In a "modified" clickwrap agreement, users are "provided notice and an opportunity to review terms of service prior to acceptance." *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011). In a browsewrap agreement, "a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen*, 763 F.3d at 1176.

Courts' treatment of browsewrap agreements is instructive in analyzing the validity of their clickwrap counterparts. Because users are not required to affirmatively agree to the terms of a browsewrap agreement, their validity "depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.* (quoting *Van Tassell v. United Mktg. Grp.,*

*LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011)). If a user lacks actual knowledge of the agreement, its validity "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177.

Thus, the court in *Nguyen* sided with the plaintiff when Barnes & Noble sought to compel arbitration of his claim. *Id.* at 1180. Barnes & Noble's website made its terms of service, which included an arbitration clause, available via hyperlink at the bottom corner of every page on its website, and asserted that "[b]y visiting any area in the Barnes & Noble.com Site . . . [users were] deemed to have accepted" the terms. *Id.* at 1174. The court held

> that where a website makes it terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.

*Id.* at 1178-79.

In contrast, the plaintiff in *Swift* brought suit over a modified clickwrap agreement pertaining to a Zynga program called YoVille. The first time a user played a Zynga game through a social media platform, she encountered a screen stating in part "Allow Access?":

> Underneath, there is a large 'Allow' button, a smaller 'cancel' link, and smaller grey font stating 'By proceeding, you are allowing YoVille to access your information and you are agreeing to the [blue hyperlink] Facebook Terms of Service in your use of YoVille. By using YoVille, you also agree to the YoVille [blue hyperlink] Terms of Service.

*Swift*, 805 F. Supp. 2d at 908. Within the YoVille terms was an arbitration clause. *See id.* at 907. The court noted that, "where a plaintiff was provided notice and an opportunity to review terms of service prior to accepting them," that was "sufficient to put [her] on notice of the terms to which she was assenting." *Id.* at 911-12 (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. C 04-04825 JW, 2005 WL 756610, at *4-5 (N.D. Cal. April 1, 2005)).

Other cases are consistent with the holding in *Swift*. For example, in *In re Facebook Biometric Information Privacy Litigation*, three plaintiffs challenged clickwrap agreements

required by Facebook in order to sign up for its social network. 185 F. Supp. 3d 1155, 1162 (N.D. Cal. 2016). The first plaintiff "had to click a box next to the words, 'I have read and understood the Terms of Use, and I agree to them'" before being able to click a button that said "Register Now!" *Id.* at 1162-63. The words "Terms of Use" were hyperlinked to the full text of the policy. *Id* at 1162. The second plaintiff "had to click a box next to the words, 'I have read and agree to the Terms of Use and Privacy Policy'" before clicking a button that said "Sign Up." *Id.* at 1163. The words "Terms of Use" and "Privacy Policy" were similarly hyperlinked. *Id.* The third plaintiff did not have to check a box—instead, he had to click a button that said "Sign Up," underneath which was text that read, "By clicking Sign Up, you are indicating you have read and agree to the Terms of Use and Privacy Policy." *Id.* The words "Terms of Use" and "Privacy Policy" were similarly hyperlinked. *Id.* The court upheld all three clickwrap agreements as valid. *Id.* at 1166. With regard to the third plaintiff's agreement, which did not require him to affirmatively click a checkbox, the dispositive factor was that he "had to take some action—a click of a dual-purpose box—from which assent might be inferred." *See id.*

The UPS My Choice Service Terms, as presented to Plaintiff in this case, comprise a modified clickwrap agreement. Unlike the browsewrap agreement at issue in *Nguyen*, enrolling in My Choice requires clicking a checkbox indicating assent to the UPS My Choice Service Terms. Like the agreements in *Swift* and *Facebook*, those terms are hyperlinked. The wrinkle in this case has to do with the language of the My Choice terms, which purport to incorporate by reference the UPS Tariff/Terms and Conditions of Service. Calderon Decl. ¶ 8. To access the Tariff/Terms and Conditions of Service, users are not provided with a hyperlink, but instead are directed to navigate to ups.com. *See id.* From there, the user must intuit how to access the actual text of those terms, which requires clicking a hyperlink at the bottom of the page that reads "Service Terms and Conditions," Liberatore Decl. ¶ 3, and then choosing the UPS Tariff/Terms and Conditions of Service out of a list of eight hyperlinked sets of terms, *id.* ¶ 7. Only then could Plaintiff have accessed the UPS Tariff/Terms and Conditions of Service and the arbitration clause at issue in this motion.

While it is clear that Defendant did not make it particularly easy for users to access the

7

UPS Tariff/Terms and Conditions of Service, Plaintiff's assent to the UPS My Choice Service Terms—and thus to the UPS Tariff/Terms and Conditions of Service—was unambiguous. Before finalizing his enrollment in My Choice, he checked a box that read "By selecting this checkbox and the Continue button, I agree to the UPS Technology Agreement and the UPS My Choice® Service Terms." Calderon Decl. ¶ 5. The UPS My Choice Service Terms, in turn, not only "expressly" incorporated by reference the UPS Tariff/Terms and Conditions of Service, but also stated that Plaintiff "expressly acknowledge[d] having reviewed, understood and agreed to the UPS Tariff/Terms and Conditions of Service . . . and accept[ed] their application . . . ." *Id.* ¶ 8. The key question is whether Plaintiff was on inquiry notice of the relevant terms. *See Nguyen*, 763 F.3d at 1176. By marking this checkbox, Plaintiff unequivocally represented that he was— regardless of whether he actually read the terms. Failure to read a contract in full does not excuse a party from being bound by its contents. *See Guadagno v. E*Trade Bank*, 592 F. Supp. 2d 1263, 1271 (C.D. Cal. 2008) ("[A] party may be bound by a 'clickwrap' agreement if the terms are clear and acceptance is unambiguous, regardless of whether he actually reads them."); *see also Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012) (finding, in an action against a condominium developer, that "[a]n arbitration clause within a contract may be binding on a party even if the party never actually read the clause").

For these reasons, the Court finds that Plaintiff had sufficient inquiry notice of the UPS Tariff/Terms and Conditions of Service and the arbitration clause therein. Without question, Defendant's current version of the UPS My Choice Service Terms (which facially describes the terms of the arbitration agreement and includes a direct hyperlink to the UPS Tariff/Terms and Conditions of Service) is better and clearer than the version that existed in June of 2016. Nonetheless, Defendant has met its burden of proving by a preponderance that Plaintiff is subject to a valid agreement to arbitrate.[4]

---

[4] Plaintiff also argues that "UPS's arbitration provision is buried as deeply as possible under a mountain of documents and terms," referring specifically to the UPS Technology Agreement. *See* Dkt. No. 29 at 19. Users must also assent to the UPS Technology Agreement before enrolling in My Choice, and like the UPS My Choice Service Terms, the UPS Technology Agreement is presented as a hyperlink. *See* Calderon Decl. ¶ 5 (attached screenshot). But Plaintiff's argument is inapposite: the language of the UPS Technology Agreement makes clear that it is relevant only

8

**B. This dispute falls within the scope of the arbitration agreement**

Having determined that a valid agreement to arbitrate exists, the Court now turns to the question of whether Plaintiff's claims regarding the Delivery Area Surcharge fall within the scope of that agreement, and concludes that they do. Underscoring this analysis is California's "strong public policy in favor of arbitration." *See Gravillis*, 143 Cal. App. 4th at 771. Courts construe arbitration clauses broadly, such that Plaintiff's "factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." *Simula*, 175 F.3d at 721 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985)). The dispute at hand should thus generally be interpreted to fall within the scope of the arbitration clause, "unless it may be said with positive assurance that the arbitration provision is not susceptible of an interpretation that covers the asserted dispute." *Gravillis*, 143 Cal. App. 4th at 771 (quoting *O'Malley v. Wilshire Oil Co.*, 49 Cal. 2d 482, 490-91 (1963)). "Whether a contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself . . . ." *Id.* at 772.

Here, Plaintiff brings suit to challenge Defendant's practice of charging retail customers a Delivery Area Surcharge, allegedly in a manner that is at odds with its published rate schedule. Compl. ¶ 1. The plain language of the arbitration clause makes clear that this is precisely the sort of dispute it was meant to encompass. The UPS Tariff/Terms and Conditions of Service state "any controversy or claim, whether at law or at equity, arising out of or related to the provision of services by UPS . . . shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration." Liberatore Decl. ¶ 4. As a matter of common sense, the Delivery Area Surcharge arises out Defendant's provision of services: it is part of the cost of using their services. There is no interpretation of the clause's language that results in Plaintiff's claim being outside the scope of the arbitration clause.

Because Plaintiff cannot show "with positive assurance" that his claim does not fall within

---

to the licensing of UPS' technology, Hansen Decl. ¶ 3, and its forum selection clause applies only to "any claim, case, or controversy arising out of or relating to this agreement [*i.e.*, the Technology Agreement]," Dkt. No. 29-3 at 9. In other words, the relevant arbitration provision here is the one contained in the Tariff/Terms and Conditions of Service document discussed above.

9

the scope of Defendant's arbitration provision, he fails to meet his burden, and fails to overcome the strong presumption in favor of arbitration.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion and **STAYS** this case pending completion of arbitration. The parties are directed to file a joint status report regarding the status of the arbitration proceeding 120 days from the date of this order and every 120 days thereafter unless otherwise ordered.

**IT IS SO ORDERED.**

Dated: 9/18/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge